(No. 33551.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES BISHOP BANKS, Plaintiff in Error.

*Opinion filed September 23, 1955—Rehearing denied Nov 21, 1955.*

EUCLID LOUIS TAYLOR, of Chicago, (WILLIAM L. CAR-LIN and LOUIS A. ROSENTHAL, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, and RUDOLPH L. JANEGA, of counsel,) for the People.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

Plaintiff in error, hereinafter designated defendant, was convicted by a jury of the murder of one Marvin Dudley on April 16, 1953, in Cook County, and was sentenced to 99 years in the penitentiary. This writ of error is for the purpose of reviewing that conviction and sentence.

The defendant complains that the State did not make out a *prima facie* case; that the motion of the defendant for a directed verdict should have been allowed; that the manifest weight of the evidence was against the verdict and judgment; that the court erred in allowing a motion of the State to make Josephine Williams the court's witness over objections of defendant; that the court erred in giving unnecessarily repetitious and abstract instructions for the State, and that the court erroneously allowed into evidence, over objection duly made, testimony as to certain discharged pistol shells.

The evidence on behalf of the People consisted of the testimony of Erskin J. Dudley, brother of the deceased, police officers John Deady and Henry Sprengel, James Brenker and Vassie Lee, as well as a stipulation of the testimony had and taken at the inquest held over the body of Marvin Dudley and a stipulation that the coroner's physician would testify that the deceased, Marvin Dudley, came to his death as a result of a bullet wound in the chest and also a stipulation of testimony of James Brenker if called as a witness in rebuttal.

The defendant's evidence consisted of the testimony of the defendant and, in addition, several witnesses who testified to the good reputation of the defendant for being a peaceable and law-abiding citizen.

Josephine Williams, a principal witness, was a witness on behalf of the People, and then was called as the court's witness. Thereafter she was called as witness by the defendant, and during such examination was again made the court's witness.

There were two eyewitnesses to the tragedy: one, Josephine Williams, was a married woman in the process of securing a divorce; the other was the defendant, James Bishop Banks. He likewise was married, the father of two children but separated from his wife. Banks testified he divorced his wife some time in April, 1953, in the city of Chicago. Defendant Banks had known Mrs. Williams since 1942. Although both Mrs. Williams and Banks were already married, he and she had become engaged to be married. He had given her a ring, the wedding was scheduled for June, 1953. On April 12, 1953, four days before the fatal shooting, Banks gave Mrs. Williams money to retain a lawyer to secure her divorce.

Marvin Dudley, the deceased, became acquainted with Josephine Williams in 1951. Banks testified he first met Dudley in the spring of 1951 when Josephine Williams introduced them. This introduction took place in her home.

They spent about five minutes together at that time. The next time Banks met Dudley was about three to four months later and again the meeting took place at Mrs. Williams's home. Banks and a friend were in Mrs. Williams's apartment awaiting Mrs. Williams's return from church. When she arrived Dudley and his brother were with her. Some conversation was had between Banks and Dudley concerning an automobile. Banks testified that Dudley had a pistol and hit him once in the head. Dudley and his brother stayed for about ten minutes and left Mrs. Williams's apartment leaving Mrs. Williams and Banks there. The next meeting between Banks and Dudley took place in 1953, three days prior to April 16. Again the meeting took place in Josephine Williams's room, a one-room bedroom apartment on the second floor of a four-story flat-type building in the city of Chicago. When Dudley arrived on this occasion, Banks was in Mrs. Williams's room and she was down the hallway in the bathroom. Dudley rang the bell and Banks let him in. Dudley and Banks waited and Mrs. Williams returned. A general conversation ensued between Mrs. Williams and Dudley in Banks's presence. Dudley made a remark that Banks wasn't good enough for Mrs. Williams and that there wasn't going to be any wedding. Banks testified he did not reply. Mrs. Williams testified that on this occasion Dudley stayed for about twenty-five minutes. She asked him to leave and shortly thereafter he did.

On April 15, 1955, Dudley phoned Josephine Williams. She was not in and he left word for her to phone him. She called him the next day. He told her he wanted to see her; that he had something to tell her. Dudley arrived at her room about 1 :oo P.M. on the afternoon of April 16. For the most part he and she stayed in her bedroom until the time of his death. During his stay each left the room separately at various times, he to move his car and go to the bathroom; she to make a phone call to her employer

advising she would not report for work that evening and also to go to the bathroom.

At approximately 8:10 P.M. on the evening of April 16, Banks arrived at the Williams flat and gained entrance to the building. Upon arriving at Mrs. Williams's door, he testified: "I found it was unlocked. I opened the door. I walked in. Much to my surprise, I saw a man on the bed. He grabbed a gun. Marvin rushed toward me and shot. I ducked, run my hand in my coat pocket and I started shooting. I was just shooting, no aim, no nothing, just scared and shooting. It was an automatic and it kept shooting in all directions."

The shots attracted other occupants of the building to the Williams's bedroom. The first to arrive was James Brenker, uncle of Josephine Williams. He testified that his room was adjacent to that of Josephine Williams; at about 8:00 P.M. on April 16 he heard some shots. He left his room and ran into the hallway. When he got to the door from the hallway to Josephine Williams's room, defendant was standing in the doorway with a pistol in his hand pointing in the general direction of a man lying on the floor in the bedroom. Brenker testified he grabbed the defendant, Banks, and said to him, "Man, you done killed this man in my house. What in the world am I going to do? Get out of here." Banks made no reply but turned and ran out of the building. In his flight his gun fell out of his pocket and was lost. Banks got a ride with a truck driver going to St. Louis. In St. Louis he worked at two jobs under the name of Jerry Barker. He then went to Ohio where he was subsequently arrested and extradited.

There is no dispute that the defendant killed Marvin Dudley. The only dispute is as to whether the homicide was done with malice aforethought, either express or implied or whether it was committed in self-defense.

As indicated by the evidence, the claim of the State is that the defendant, Banks, on discovering Marvin Dudley

naked in bed in the apartment of his fiance, murdered him. The defendant's theory is that Banks was carrying a gun for protection because he was in fear of his life of Dudley; that when in Josephine Williams's apartment, Dudley saw Banks open the door, Dudley grabbed his gun and opened fire on Banks, Banks fearing for his life shot and killed Dudley in self-defense.

Mrs. Williams, an eye witness and engaged to the defendant, was called first by the State and then as the court's witness. She testified that when Dudley arrived at her apartment on April 16 he had a gun and that when he undressed and got into bed he put the gun on a dresser close to the bed. Further she testified that on the night of April 16 when the defendant, Banks, opened the bedroom door and came in the room far enough to be seen, the deceased said "wait a minute," got out of bed, got the gun off the dresser, went toward the door and fired the first shot. When she heard the shots she started screaming and tried to push the door closed. Neither before nor after the shots did she or Dudley talk to Banks. On cross-examination by the State she was asked:

Q. "Did you ever tell anyone before this date that Dudley went to the door and fired the first shot?"

A. "No. I got a reason why."

Q. "Answer the question."

A. "No."

Q. "You never told that story before."

A. "No."

John Deady, a police officer, testified that responding to a police call on the evening of April 16, he went up to the second floor and into Mrs. Williams's bedroom. When he came in he saw the body of a nude man whom he later determined was Marvin Dudley in a sitting position on the floor, with his head against the table. Dudley was dead from bullet wounds. He testified that he saw a woman sitting on the bed with her feet drawn up under her. This

woman was apparently in the nude and was holding something up in front of her. He later determined that woman to be Josephine Williams.

He further testified that he examined the area around the body of Dudley and found no gun. James Brenker and Vassie Lee, caretaker of the building, both testified they saw the body on the floor immediately after the shooting but saw no gun.

After the People had rested their case the defendant called Josephine Williams as a witness, and at the request of counsel for Banks, Mrs. Williams was designated as the court's witness and cross-examined by both the State and plaintiff in error. On this, her second appearance on the witness stand, Mrs. Williams testified on cross-examination by the State that her uncle, James Brenker, came in the room after the affray and picked up the pistol used by Dudley. Her testimony on this point is as follows:

Q. "Now as to the gun you say your uncle picked up, you never told anyone about that before did you?"

A. "No."

Q. "And this is the first time you have ever told anybody about your uncle picking the gun up off the floor?"

A. "I told the lawyer, because that is my uncle, my blood uncle. I wanted him to tell the truth."

Q. "Which lawyer? What do you mean 'told the lawyer'? The lawyer who is getting you a divorce?"

A. "No, I told Mr. Taylor that today, because I called my uncle, because I didn't blank out."

Q. "Is that the first time you had ever told anyone that a pistol was taken from the floor, is that right, when you told Mr. Taylor?"

A. "Well, I told the police it was there. They asked me what happened to it. I said, 'I don't know, because people rushed in,' but I know who got it. I saw him pick it up. Why, I don't know! It didn't make any difference one side or the other with him."

At the conclusion of defendant's case it was stipulated that if James Brenker were called as a witness in rebuttal he would testify he did not pick up the gun and take it away as testified to by Mrs. Williams; that he never saw a gun in the apartment.

Defendant Banks took the stand in his own behalf. He stated he was employed as a truck driver by trade; that on April 16, 1953, he was five feet six inches tall and weighed about 150 pounds; that deceased was about six feet tall and weighed about 220 pounds; that he first met Dudley at Josephine Williams's apartment in 1951, and the second time he saw him, at the same apartment, the deceased, in the presence of his brother, threatened to kill him, and hit him in the head with a pistol. He further testified that he next saw deceased about three days prior to April 16, 1953, at Josephine's room, at which time deceased told him he wasn't good enough for Josephine and there wasn't going to be any wedding. Banks further testified on direct examination as follows:

Q. "Did you fire a gun on the 16th day of April, 1953, that hit, out of which the bullet struck Mr. Dudley?"

A. "Yes."

Q. "Why did you fire those shots?"

A. "Because I believed my life was in danger."

Q. "Would you, did you fire only after he had fired the first shots at you?"

A. "Yes sir, afterwards."

On cross-examination, defendant testified that he had a gun, a P.38 model, with him when he arrived at Mrs. Williams's apartment on April 16, and had had the same gun since 1949; when questioned as to when he started carrying the gun in his car, he testified as follows:

Q. "How long had you been carrying a gun in your car?"

A. "I hadn't been carrying a gun in my car."

Q. "On this date you were carrying it in your car?"

A. "Yes, I had."

Q. "When did you put it in your car?"

A. "I put it in the car that night, after the 13th, that night, the 13th."

Q. "You had it in your car the 13th, 14th, 15th and 16th?"

A. "That's right."

Q. "What kind of gun was it?"

A. "It was a P.38."

We have detailed the evidence at some length to show that extreme conflict exists between the version of the homicide as developed by prosecution and the defense. In view of this conflict it was a question of fact for the jury as to whether plaintiff in error was the aggressor and whether there was apparently any reasonable cause for him to apprehend serious danger to himself. The record before us indicates that Banks and Dudley met twice in 1951, were together for a matter of fifteen minutes and on one of these occasions Dudley hit Banks. They did not meet again until April 13, 1953, nearly two years later. At this meeting Banks testified there was no conversation between Dudley and him. At the time of the shooting on April 16, the only remark was made by Dudley, who said "wait a minute." Neither Banks nor Mrs. Williams said anything. Taking into consideration all that transpired at the three meetings preceding the April 16 meeting, the jury could have determined that Dudley did not put Banks in fear of his life. Mrs. Williams first told the police officers she did not know what happened to the Dudley gun. On the third day of the trial she testified for the first time that since Dudley's death she told Banks's lawyer that Mr. Brenker had taken Dudley's gun. Brenker denied seeing a gun and denied taking one from Mrs. Williams's room. Police officer John Deady and Vassie Lee both testified

they saw no gun. It is also interesting to note that, when called as a witness, Mrs. Williams, for the first time, told the story of Dudley firing the initial shot.

The jury saw and heard the witnesses testify and was in the best position to judge the weight and credibility of their testimony. Defendant admitted he fired the shot by which Dudley met his death. The evidence that it was fired in self-defense was not believed by the jury. This court will not sustain a conviction on a criminal charge where the evidence is improbable, unsatisfactory or reasonably doubtful. However, we will not substitute our judgment for that of the jury or judge sitting without a jury, in merely weighing the credibility of the witnesses, where the testimony is conflicting. (*People* v. *Franklin,* 390 Ill. 108; *People* v. *Langer,* 384 Ill. 608.) From the state of the record we are of the opinion that the action of the jury was not unreasonable or improper. Careful consideration of all the evidence convinces us that we would not be justified in setting aside the verdict of the jury.

From the record before us we cannot agree with plaintiff in error that the trial court erred in allowing the motion of the State to make Josephine Williams the court's witness over objection of the defendant. The practice of the court's calling a witness at the request of the prosecution in a criminal case has been recognized where the person called is an eyewitness to the crime and the State's Attorney doubts the veracity and integrity of such witness. (*Carle* v. *People,* 200 Ill. 494; *People* v. *Laster,* 413 Ill. 224; *People* v. *Bennett,* 413 Ill. 601.) When called by the court, such witness is open for cross-examination by either side. Subsequent to *Carle* v. *People,* 200 Ill. 494, where the rule was announced, we later stated that this rule should be confined within narrow limits, being adopted only where it is shown that otherwise there might be material injustice. (*People* v. *Johnson,* 333 Ill. 469.) Mrs. Williams witnessed the shooting of Dudley by the defend-

ant. There was ample cause for the State's Attorney to doubt her veracity and integrity. Yet without her testimony there was a definite likelihood of miscarriage of justice. Further the record shows that defendant's counsel fully cross-examined the witness on all matters brought out on examination by the State's Attorney. In addition, while Mrs. Williams was so testifying on cross-examination by defendant, he introduced as his exhibit a green uniform claimed by Mrs. Williams as the dress she had on at the time of the homicide. Further, plaintiff in error after objecting to Mrs. Williams being called by the State as the court's witness, called her as a witness for defendant. After several preliminary questions, an exchange took place between opposing counsel on the status of the witness. At the request of counsel for defendant, Mrs. Williams was designated as the court's witness and again cross-examined by both defense and prosecution. Under the circumstances of this case we believe Josephine Williams was properly made the court's witness.

All of the errors assigned and argued with respect to the giving of instructions have been examined and we are convinced that the jury was fully instructed with respect to the law of this case, and that, considering the instructions as a series, there are no such repetitions, omissions or inaccuracies as were likely to mislead the jury. To require absolute and technical accuracy in instructions would, as a general rule, defeat the ends of justice and bring the administration of the criminal law into disrepute and contempt. It is sufficient when instructions, considered as a whole, substantially and fairly present the law of the case to the jury. (*People* v. *Scimeni,* 316 Ill. 591; *People* v. *Lloyd,* 304 Ill. 23; *People* v. *Haensel,* 293 Ill. 33.) This we believe to be the situation here.

The contention of plaintiff in error that the court admitted into evidence over objection certain P.38 pistol shells found at the scene of the homicide by police officer

John Deady is without merit. The defendant admitted firing several shots from a P.38 pistol at the place where the shells were found. Their admission into evidence under such admission could not be prejudicial. To elaborate further on this and other matters presented and argued by plaintiff in error would be to unduly lengthen this opinion without any resulting benefit.

The record in this case establishes no error prejudicial to defendant, and the judgment of the criminal court of Cook County is affirmed. *Judgment affirmed.*