Docket No. 100983.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
JOSEPH BANNISTER, Appellant.

*Opinion filed October 17, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with
opinion.

Chief Justice Fitzgerald and Justices Thomas, Garman, Karmeier,
and Burke concurred in the judgment and opinion.

Justice Kilbride dissented, with opinion.

**OPINION**

Following a bench trial in the circuit court of Cook County,
defendant, Joseph Bannister, was convicted of first degree murder
(720 ILCS 5/9–1(a) (West 2000)), attempted first degree murder (720
ILCS 5/8–4, 9–1(a) (West 2000)), and home invasion (720 ILCS
5/12–11(a) (West 2000)). At a separate sentencing hearing, a jury
found defendant eligible for the death penalty. After considering
evidence in aggravation and mitigation, the jury concluded that death
was the appropriate sentence. 720 ILCS 5/9–1(g) (West 2006).

The trial court sentenced defendant to death on the murder
conviction. The trial court also sentenced defendant to concurrent
prison terms of 45 years on the attempted murder conviction and 30

years on the home invasion conviction. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). We affirm.

## I. BACKGROUND

Because defendant does not challenge the sufficiency of the evidence, we need not set forth a detailed recitation of the facts. Defendant was charged in a multicount indictment with, *inter alia*, the first degree murder of Henrietta Banks; the attempted murder of Henrietta's sister, Sharon Banks; and home invasion. Following admonishments from the trial court, defendant waived a jury for the guilt-innocence phase of the proceedings, and the court conducted a bench trial.

The State's evidence at trial was essentially as follows. Defendant and Sharon met in September 1992. They were living together when their daughter, Britnee Bannister, was born in 1993. Sometime in 1997, Sharon moved to 1904 N. Kedzie Avenue in Chicago, where she lived with Britnee and her three other children. Also living with Sharon and her children were Sharon's mother, Arritta Banks; Sharon's sister, Henrietta; and Henrietta's two children. Defendant did not initially move into the Kedzie Avenue residence with Sharon, but sometime in 1998, defendant lived there for six or seven months as he and Sharon attempted to nurture their relationship. Defendant contributed to Britnee's support. However, defendant did not pay any rent and his name was not on the lease.

A few months prior to his crimes, defendant had threatened Sharon during several altercations. On August 21, 2000, Sharon was driving east on Jackson Boulevard, with Henrietta in the front passenger seat, when she encountered defendant driving westbound. Defendant saw Sharon, turned his car around and followed her. Defendant then rear-ended Sharon's car twice, causing her bumper to fall off. They stopped their cars. Defendant exited his car, approached the driver's side of Sharon's car, banged on her window, and ordered her to get out of her car. Sharon refused and called the police. Sharon then moved her car out of the way of traffic. Defendant returned to Sharon's car and ordered her to get out of the car, saying that he was going to kill Sharon. The next day, Sharon went to the circuit court,

-2-

where she received an emergency order of protection and a court date of September 12, 2000.

On September 12, 2000, Sharon, accompanied by Henrietta and Arritta, went to court. Outside of the courtroom, in front of Henrietta and a court advocate, defendant threatened Sharon, saying: "Bitch, I'm going to kill you." On September 16, 2000, Sharon and Henrietta were with their children at a playground on West Harrison Street. Defendant arrived and wanted to speak with Sharon, who told defendant to leave them alone. Defendant warned Sharon that he was going to "fuck her up," which Sharon interpreted as defendant was going to take her life. Sharon called out for someone to gather her children and, as she telephoned police, defendant left the area.

On September 23, 2000, defendant committed the acts giving rise to this prosecution. At approximately noon, Sharon, Henrietta, their children, and Arritta were all at their Kedzie Avenue residence. It was a duplex apartment with bedrooms on the second floor and the kitchen and living room on the first floor. In addition to the front door, their apartment had another door connecting to an outside stairway on the side of the building. Defendant broke open this side door, damaging the door and locks thereto. Defendant entered the residence, wearing all black and holding a handgun. Sharon's children ran to her, but she ordered them to move away from her. Sharon was looking into defendant's eyes when he raised the gun and shot her. The first bullet grazed Sharon's face, entered her left shoulder, and exited her back. Sharon collapsed on the floor.

Defendant stepped over Sharon and approached Henrietta, who was sitting on a couch. Defendant shot Henrietta three times: in the forehead, in the right side of the head over the ear, and in the right upper back. Defendant returned to Sharon, stood over her, and shot her again, saying, "Die bitch." This bullet entered Sharon's rib cage and was still lodged there when she testified at trial. Defendant then turned to Arritta, with his gun pointing at her. Britnee jumped into Arritta's arms and asked defendant whether he was going to kill all of them. Defendant then ran out of the apartment. Emergency personnel were summoned.

Sharon; Arritta; and Sharon's children, Latoria Moore and Torie Moore, each testified in court as to defendant's acts in the apartment that day. By stipulation, the trial court admitted into evidence the

depositions of Britnee and Cedric Hunter, another of Sharon's children. In their depositions, Britnee and Cedric each related defendant's acts in the apartment in accord with each other and with the in-court witnesses.

Anibal Alvarado's father lived next to the Banks residence at 1906 N. Kedzie Avenue. At approximately noon on September 23, 2000, Alvarado was working on a car in the backyard of his father's residence. Alvarado saw defendant, who was wearing all black, walk toward 1904 N. Kedzie Avenue, but did not see him enter the building. Alvarado visited his father every day, and had seen defendant in the past "with the kids and throwing out trash and all of that." Alvarado heard gunshots and children screaming; he then saw defendant retrace his steps through the alley, get into a car parked on Cortland Street near the alley, and drive away. Alvarado walked up the outside stairway of the 1904 building into the apartment. He saw Henrietta slumped over on a couch and Sharon lying on the floor. Alvarado checked Henrietta for a pulse, could not find one, and observed that she was not breathing. Alvarado assisted Sharon until paramedics arrived.

Chicago Police Detective James DeLaFont was assigned to investigate the shootings and arrived at the scene early that afternoon. After interviewing witnesses, Detective DeLaFont learned that he was looking for defendant, and received a photograph of defendant. On the afternoon of February 11, 2001, Chicago Police Officer Robert Walker and his partner, Officer Robert Burrell, responded to a report of a wanted person. They proceeded to the alley behind 11594 S. State Street, where Officer Walker saw defendant standing. Officers Walker and Burrell exited their squad car, approached defendant, and asked him for his name. Defendant identified himself as Robert Wallace. During this time, additional officers arrived. The officers arrested defendant as Joseph Bannister, transported him to the local police station, and notified detectives. Defendant was subsequently transported to Area Five police headquarters.

Defendant eventually gave the following statement. On September 23, 2000, defendant responded to a page from Sharon. He told her that he was coming to the apartment to take a television and some furniture and clothing. Defendant also wanted to see his daughter Britnee. Sharon replied that defendant could not have those

items because they were for the family and not for him. Sharon also informed defendant that he could not see Britnee without a court order. Defendant told Sharon that he would wait until Britnee was old enough to decide for herself if she wanted to see him. Defendant told Detective DeLaFont and his partner that defendant was exasperated with Sharon and the way she treated him. Defendant stated that he went to Sharon's apartment, used the outside stairs, let himself in with his key, shot Sharon, and then immediately left the apartment. Defendant noticed that Sharon's mother, sister, and several children were there, but nothing else happened.

Upon further questioning, defendant stated that he had said enough and that he would say no more unless he received certain guaranties. The detectives rejected defendant's attempt to bargain with them.

Defendant did not present evidence and, after receiving admonishments from the trial court, elected not to testify. The defense case was that the State failed to prove defendant guilty of the charged offenses beyond a reasonable doubt. In closing argument, defense counsel attacked the credibility of the State's witnesses and described purported discrepancies in their testimony. The trial court found defendant guilty of the murder of Henrietta, the attempted murder of Sharon, and home invasion.[1]

Following admonishments from the trial court, and against the advice of defense counsel, defendant chose to have the death sentencing hearing conducted before a jury. At the eligibility phase, the State presented the in-court testimony of Sharon, Cedric, Latoria, Arritta, Alvarado, and Detective DeLaFont, which was consistent with their testimony at the guilt phase of the trial. By stipulation, the trial court admitted into evidence Britnee's deposition testimony. The State also presented the testimony of additional witnesses.

---

[1]Defendant was also charged with the attempted murder of Arritta, and the trial court found defendant guilty as charged. However, the court subsequently vacated that conviction. Also, defendant was charged with aggravated battery with a firearm in relation to Sharon. The trial court found that this charge merged with the conviction for Sharon's attempted murder.

Chicago Police Officer Debra Woldeit testified that she and her partner were among the first law enforcement officers to arrive at the scene of the shooting, where she observed damage to the side door. Dr. Michelle Mellett testified that she treated Sharon for multiple gunshot wounds. One of the bullets caused a large graze wound across Sharon's left cheek, entered the area of the left collarbone and exited out of the back. Another bullet entered the right side of Sharon's chest, broke the fifth rib, and lodged in the spine. Sharon was in critical condition, having difficulty breathing, and required insertion of a chest tube to save her life. Sharon was conscious and repeatedly stated that the father of her child had broken into her home and shot them, and that her sister was dead.

By stipulation, the trial court admitted into evidence a certified copy of: (1) defendant's conviction of the first degree murder of Henrietta, the attempted murder of Sharon, and home invasion; and (2) defendant's birth certificate, bearing a birth date of December 11, 1966. Following admonishments from the trial court, defendant elected not to testify or call any witnesses at the eligibility phase of the death sentencing hearing.

After hearing closing arguments and receiving the trial court's instructions, the jury found beyond a reasonable doubt that: (1) defendant was over 18 years old at the time of the murder; and (2) defendant committed the murder in the course of another felony, *i.e.*, home invasion. Thus, the jury found defendant eligible for the death penalty. The trial proceeded to the second stage of the death sentencing hearing.

The State's evidence in aggravation included the testimony of Wellington Rolle. In December 1984, Rolle was a member of a street gang, and he knew defendant to be a member of a rival street gang. Rolle was attending a party in an apartment. Hearing a "commotion," he stepped out of the apartment into the building's "breezeway," which he described as a hallway on the exterior of the building. Rolle heard a gunshot. He then saw defendant produce a handgun and aim it at Rolle's face. Defendant then shot Rolle in the face. Defendant continued to shoot at Rolle as he ran to his mother's apartment in the housing complex. He was taken to a hospital where he was not expected to live. The bullet struck Rolle's jaw, grazed his windpipe, and lodged in the back of his neck, two inches from his spine. In July

1985, defendant was convicted of attempted murder, aggravated battery, and armed violence. In August 1985, defendant was sentenced to a 15-year prison term. Having violated his probation for the 1984 robbery, defendant was sentenced on that conviction to seven years' imprisonment.

Sharon testified in aggravation. As recited earlier, defendant met Sharon in September 1992, and they were living together when their daughter Britnee was born in 1993. Sometime that year Sharon and defendant had an altercation, and Sharon filed a child support claim and obtained an order of protection. Sharon told defendant he could no longer live with her family. In May 1993, defendant was arrested for selling drugs and, in 1995, he pled guilty to possession of a controlled substance with intent to deliver and was sentenced to four years' imprisonment. After defendant was imprisoned, Sharon moved to the Kedzie Avenue residence without informing defendant because she was afraid of him. During this incarceration, defendant harassed Sharon with letters and telephone calls from prison.

In January 1997, defendant was released from prison. He learned that Sharon was living at the Kedzie Avenue address and went to see her. Sharon did not allow defendant to move in with her and her family, but allowed him occasionally to spend the night and to visit Britnee.

In August 1997, the relationship, according to Sharon, became "very violent." Defendant took Britnee away from Sharon and kept her for a week. According to Sharon: "I called the police constantly. He comes back with the baby playing the baby game. I will give you your baby if you will come and talk to me." Defendant returned Britnee. When he did so, however, he also pushed Sharon to the ground. When Sharon attempted to defend herself, defendant struck her head with his hands. Sharon's mother, Arritta, intervened. Sharon called the police; defendant was still there when they arrived. Defendant told the officers that he was returning the baby. He was not arrested and he left the residence.

Sharon testified regarding many subsequent encounters with defendant. For several years, defendant repeatedly threatened Sharon with violence if she did not speak to him. Indeed, one such encounter resulted in defendant being convicted of domestic battery and phone harassment, and ultimately sentenced to 130 days in the Cook County

jail. This pattern continued until September 23, 2000, when defendant committed the first degree murder of Henrietta, the attempted murder of Sharon, and home invasion.

The State also presented evidence of defendant's significant disciplinary infractions while in the custody of the Illinois Department of Corrections, from 1985 to 1992, and of Cook County jail pending trial. The infractions included assault, intimidation, and possession of narcotics and homemade weapons. The State rested in aggravation.

At the outset of the mitigation portion of the death sentencing hearing, defendant informed the trial court that he did not want to present any evidence in mitigation. Despite this request, the trial court allowed defense counsel to present mitigation evidence. Anita Henry, defendant's half-sister, and Michael Herring, defendant's half-brother, testified in mitigation. They testified essentially that defendant maintained a relationship with Britnee and provided for her. Herring never saw defendant hostile or angry at Sharon or Britnee. However, Henry acknowledged that there were areas of Sharon and defendant's relationship about which she did not know, including that Sharon had an order of protection against defendant.

At the close of the death sentencing hearing, the jury found that death was the appropriate sentence. The trial court ultimately denied defendant's motions for a new trial and a new sentencing hearing. The court entered judgment on the finding of guilt and sentenced defendant to death. The court also sentenced defendant to a concurrent 45-year prison term on the attempted murder conviction and a concurrent 30-year prison term on the home invasion conviction.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.


## II. ANALYSIS

We will discuss defendant's allegations of error in the sequence in which the alleged errors occurred in the proceedings below.

## A. Jury Waiver for Guilt Phase

Defendant first contends that he did not knowingly and voluntarily waive his right to trial by jury at the guilt/innocence phase of the proceedings. Defendant argues that the trial court incorrectly informed him of the minimum and maximum penalties for his several charged offenses.

We initially observe that defense counsel failed to object to any of the court's allegedly erroneous admonitions at trial and failed to include some of them in his posttrial motion. "*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.) *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Therefore, this issue is procedurally forfeited.

Seeking our review, defendant invokes the plain-error doctrine of Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). The doctrine serves as " 'a narrow and limited exception to the general [rule of procedural default].' " *People v. Szabo*, 113 Ill. 2d 83, 94 (1986), quoting *People v. Pastorino*, 91 Ill. 2d 178, 188 (1982). This court will review unpreserved error when a clear and obvious error occurs and: (1) the evidence is closely balanced; or (2) that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Hall*, 194 Ill. 2d 305, 335 (2000). When a defendant fails to establish plain error, the result is that the "procedural default must be honored." *People v. Keene*, 169 Ill. 2d 1, 17 (1995). In addressing defendant's plain-error contention, it is appropriate to determine whether error occurred at all. *People v. Harris*, 225 Ill. 2d 1, 31 (2007); *People v. Sims*, 192 Ill. 2d 592, 621 (2000).

The right to a trial by jury is a fundamental right guaranteed by the federal Constitution (U.S. Const., amends. VI, XIV; *Duncan v. Louisiana*, 391 U.S. 145, 149, 20 L. Ed. 2d 491, 496, 88 S. Ct. 1444, 1447 (1968)) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§8, 13). Indeed, based on our state constitution, an Illinois criminal defendant's right to a trial by jury includes the right to waive a jury trial. *People ex rel. Daley v. Joyce*, 126 Ill. 2d 209, 222 (1988). However, to be valid, the defendant must make the jury waiver knowingly and voluntarily. *People v. Bracey*, 213 Ill. 2d 265, 269

(2004); *People v. Wesley*, 30 Ill. 2d 131, 133 (1964) (and cases cited therein); accord *United States ex rel. Williams v. DeRobertis*, 715 F.2d 1174, 1178-79 (7th Cir. 1983).

Consistent with these constitutional requirements, section 103–6 of the Code of Criminal Procedure of 1963 provides: "Every person accused of an offense shall have the right to a trial by jury unless *** understandingly waived by defendant in open court ***." 725 ILCS 5/103–6 (West 2006). To the same end, our decisions have imposed on a trial court the duty of ensuring that a defendant waives the right to a jury trial expressly and understandingly. *People v. Smith*, 106 Ill. 2d 327, 334 (1985) (collecting cases). However, a trial court need not give any specific admonition or advice for a defendant to make an effective jury waiver. *In re R.A.B.*, 197 Ill. 2d 358, 364 (2001); *People v. Tooles*, 177 Ill. 2d 462, 469 (1997); *Smith*, 106 Ill. 2d at 334. The determination of whether a jury waiver is valid cannot rest on any precise formula, but rather depends on the facts and circumstances of each particular case. *Bracey*, 213 Ill. 2d at 269 (collecting cases); *Tooles*, 177 Ill. 2d at 469. The statutory requirement of a written jury waiver (725 ILCS 5/115–1 (West 2006)) does not define or give substance to the constitutional right to choose whether to have a jury trial. Rather, a written jury waiver merely memorializes the defendant's decision, allowing a court to review the record to ascertain whether a defendant's jury waiver was made understandingly. *Tooles*, 177 Ill. 2d at 468. Because the facts of this case are not in dispute, the issue is a question of law and our review is *de novo*. See *Bracey*, 213 Ill. 2d at 270; *R.A.B.*, 197 Ill. 2d at 362.

In the present case, approximately one month prior to defendant's trial, the trial court explained to defendant the two phases of a death penalty proceeding, with the first phase determining guilt or innocence and the second phase determining the appropriate penalty. The trial court also explained to defendant that, for the guilt/innocence phase, "you're entitled to a jury or you can waive the jury, and the Court, myself, would be solely responsible for deciding whether or not the State has proved you guilty beyond a reasonable doubt." The court further explained to defendant that, during the second phase of the proceedings, if necessary, "you are also entitled to a trial by jury, or if you waive the same, you place the fact finding, the sentencing finding in that case, in the hands of the Court, myself."

-10-

The court explained to defendant the trial procedure and defendant's right to a jury so that defendant could "think about it" prior to the commencement of trial.

On the date scheduled for jury selection, defense counsel stated that defendant had signed a written jury waiver for the guilt/innocence phase of the trial and signed a jury waiver for the death sentencing hearing. The trial court then, *sua sponte*, delivered an extended lecture, addressed to defendant individually, regarding defendant's charged offenses with their minimum and maximum penalties. The record evinces the trial court's difficulty with meshing familiar sentencing ranges with the relatively recent "15/20/25-to-life" firearm sentencing enhancements. See generally *People v. Sharpe*, 216 Ill. 2d 481 (2005) (discussing Pub. Act 91–404, eff. January 1, 2000).

Defendant contends that the trial court erroneously informed him of: (1) the minimum sentence he could receive for first degree murder; (2) his possible minimum and maximum sentences for attempted first degree murder and home invasion; and (3) the possibility that he could receive concurrent sentences of imprisonment. Defendant invokes the general constitutional principle: " 'Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.' " *People v. Johnson*, 75 Ill. 2d 180, 187 (1979), quoting *Brady v. United States*, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 756, 90 S. Ct. 1463, 1469 (1970). Citing *Brady*, defendant argues that his jury waiver was not knowing in that he could not understand "the consequences *of a conviction* after a bench trial where the trial court misinformed him of the mandated sentencing requirements ***. The consequences *of a conviction*, by either a jury or by the trial court, are the penalties to which the defendant will be subjected." (Emphases added.) We cannot accept defendant's argument.

Defendant does not even suggest how the completeness or correctness of the sentencing information related by the trial court would have caused him to make a different jury waiver decision. We fail to see how such information could have had any bearing on his jury waiver. "Defendant apparently attempts to equate a jury waiver with a plea of guilty where concededly the potential sentence is a

weighty consideration. Here, however, defendant had entered a plea of not guilty ***." *People v. Taylor*, 3 Ill. App. 3d 313, 316 (1972). In hearings on pleas of guilty, or in any case where the defendant offers to stipulate that the evidence is sufficient to convict, our Rule 402(a)(2) requires a trial court to inform a defendant of "the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences." 177 Ill. 2d R. 402(a)(2). This requirement "is based upon the assumption that notice of both the minimum and maximum [sentence] will give the defendant *a more realistic picture of what might happen to him.*" (Emphasis added.) 177 Ill. 2d R. 402(a)(2), Committee Comments, at lxxvii. "Contrary to the situation with a jury trial waiver, sentencing is a consequence of the acceptance of a guilty plea. Sentencing, however, is not a consequence of the election to waive a jury trial." *Horsman v. State*, 82 Md. App. 99, 104, 570 A.2d 354, 357 (1990); accord *People v. McCleary*, 353 Ill. App. 3d 916, 919-20 (2004) (distinguishing admonition required for guilty plea pursuant to Rule 402(a)(2) from requirement that jury waiver be knowingly and intelligently made). A defendant who pleads not guilty receives a full and fair trial before either a jury or the court sitting without a jury. Regardless of who serves as the trier of fact, the defendant's possible sentences would be the same.

Whether the general constitutional test of waiver is satisfied depends on the particular right being waived. *Brady*, 397 U.S. at 748, 25 L. Ed. 2d at 756, 90 S. Ct. at 1469 (observing that constitutional rights must be waived "with sufficient awareness of the relevant circumstances"). When a defendant waives the right to a jury trial, the pivotal knowledge that the defendant must understand–with its attendant consequences–is that the facts of the case will be determined by a judge and not a jury. *State v. Conroy*, 168 Ariz. 373, 376, 814 P.2d 330, 333 (1991); *Williams*, 715 F.2d at 1180.

In the present case, following the trial court's sentencing discourse, the following colloquy occurred:

> "THE COURT: Okay. Again, on the guilt or innocence phase, it's your choice as to whether or not you wish a jury or the bench trial, meaning I would decide whether the State has

-12-

proven you guilty beyond a reasonable doubt of any or all of these charges.

If there is a finding of guilt on any or all of these charges, whether by jury or by the Court, you have a second election, and that is, the death penalty phase of it.

* * *

If, however, you want [*sic*] you are entitled to a jury or a bench in the death penalty phase as well. So you could elect for a jury on the guilt or innocence and waive it for the death penalty, or you could select a jury for both the guilty or innocence [and] the death penalty phase, or you could take a bench for the guilt or innocence and also demand a jury for the death penalty phase, or you could waive the jury on both the guilt or innocence and the death penalty phase. A lot of options. You understand that?

THE DEFENDANT: When you say 'the phase,' if I take a bench, and then the penalty phase, I could have you as the impose [*sic*] or the jury?

THE COURT: Yes. You have two choices in each stage. You don't have to make the choice for the second phase at this point ***. You can leave that in here until such time as you have the trial on the guilt or innocence phase.

THE DEFENDANT: I'll wait until that point come.

* * *

THE COURT: On the guilt or innocence phase, do you wish to be tried by the jury or the Court?

THE DEFENDANT: That would be you?

THE COURT: That's right.

THE DEFENDANT: All right.

THE COURT: And you wish to be tried by jury or by the Court?

THE DEFENDANT: So I have to decide now?

[Defense Counsel]: For guilt or innocence.

THE DEFENDANT: For guilt or innocence, yeah, the Judge.

THE COURT: You're sure?

THE DEFENDANT: Yeah.

THE COURT: Is anyone forcing you or threatening you to give up your right to a jury?

THE DEFENDANT: No.

THE COURT: You're doing that freely and voluntarily?

THE DEFENDANT: Yes.

THE COURT: Any promises made to you in the event you gave up your right to a trial by jury, any promises made to you?

THE DEFENDANT: No, no.

THE COURT: And this is your signature on the jury waiver?

THE DEFENDANT: Yeah.

THE COURT: And that's what you want to do, waive your right to a trial by jury in the guilt or innocence phase?

THE DEFENDANT: Yeah.

THE COURT: Leave granted to file the jury waiver. The Court finds the defendant knowing and intelligently, freely and voluntarily executed a jury waiver on the guilt or innocence phase."

The record here establishes that defendant knew the difference between a bench trial and a jury trial and voluntarily chose the former. See *People v. McGee*, 268 Ill. App. 3d 582, 585 (1994); *People v. Geary*, 8 Ill. App. 3d 633, 635 (1972).

Further, our earlier recitation of defendant's criminal record indicates that he was no stranger to the criminal justice system. For example, we recall that defendant was convicted of several offenses relating to the December 1984 shooting of Wellington Rolle. The record in this case includes the report of proceedings of defendant's July 1985 trial for those crimes. Defendant chose a bench trial after the court admonished him that he had the right to a jury trial, which, the court advised, "takes place when twelve persons are selected by the parties and sworn that they will hear the evidence and they make the determination of questions of fact, including the ultimate question of guilt or not guilty." Therefore, in this case, when the trial court

-14-

advised defendant, in the presence of counsel, of his constitutional right to a jury trial, defendant was already familiar with this right and the relevant consequence of waiving it–that he would receive a bench trial. See, *e.g.*, *Tooles*, 177 Ill. 2d at 471; *Wesley*, 30 Ill. 2d at 133-34. We uphold the trial court's finding that defendant knowingly and understandingly waived his right to a jury trial at the guilt phase of the proceedings and that there was no denial of his constitutional right thereto. See, *e.g.*, *Tooles*, 177 Ill. 2d at 470; *People v. Steenbergen*, 31 Ill. 2d 615, 617 (1964); *Williams*, 715 F.2d at 1180; *Conroy*, 168 Ariz. at 376, 814 P.2d at 333. Having found no error, there can be no plain error. See, *e.g.*, *Harris*, 225 Ill. 2d at 31-32.

### B. Jury Waiver for Death Sentencing Hearing: Who Decides?

An Illinois criminal defendant has a statutory right to choose a jury for the death sentencing hearing, even when convicted at a bench trial. 720 ILCS 5/9–1(d) (West 2006); see *People v. Brown*, 169 Ill. 2d 132, 155-56 (1996). Defendant next contends that the trial court erred in denying defense counsel's request for a bench death sentencing hearing and granting defendant's demand for a jury to determine his sentence. Defendant contends that defense counsel, as a matter of trial strategy, should have made the ultimate choice of jury or bench death sentencing hearing.

As we earlier recounted, prior to trial defendant signed a written jury waiver for the death sentencing hearing. However, he subsequently decided to postpone that decision until the conclusion of the guilt-innocence phase of the trial. After defendant was convicted of the charged offenses, the trial court explained to defendant the two parts of a death sentencing hearing: determining death eligibility and weighing evidence in aggravation and mitigation. The trial court repeated to defendant that he was entitled to have a jury make the sentencing determination, or defendant could waive that right and have the court decide the sentence. Defendant stated that he understood the two-step nature of the death sentencing hearing; he indicated that he had discussed his choice with his attorneys; and he requested a jury for sentencing. Defense counsel immediately asked for a recess.

-15-

When the proceedings resumed, defense counsel informed the court: "Judge, the issue prior to our taking a break was whether [defendant] was going to waive a jury for the sentencing phase after having been found guilty ***. [Defendant] is not waiving jury. He is requesting a jury." The proceedings were continued for one week. At the next court date, defense counsel told the court that defendant wished to speak. However, before defendant could speak, the trial court again described to defendant the two-step nature of the death sentencing hearing, emphasizing that either a jury or the court, whichever defendant chooses, will make the sentencing decision. The trial court then advised defendant of the possible minimum and maximum penalties for his convictions. Defendant then stated that he wanted a jury for sentencing. The trial court asked defendant if he had spoken with counsel about his choice and if he was sure that he wanted a jury and not the court for sentencing. Defendant responded: "I told her [trial counsel] a jury three times, your Honor, and I'm still telling her a jury." The court explained to defendant that once selected, the jury would remain for both steps of the death sentencing hearing, and defendant responded that he understood. Defense counsel then asked defendant in open court: "Do you want the judge or the jury to decide your sentence? That is what I'm asking you." Defendant answered: "The jury."

The next day, prior to jury selection, defense counsel filed a written "Motion for Bench Hearing on Eligibility and Sentencing Phase of Above Cause." In this motion, defense counsel requested the trial court "to grant a bench hearing for the eligibility and sentencing in the above cause not withstanding [*sic*] defendant's desire for a jury for the penalty phase." Defense counsel asserted therein that "the decision for either a bench or jury at this juncture is trial strategy and lies with defendant's attorney." The trial court denied defense counsel's motion and defendant received a jury death sentencing hearing.

While an Illinois criminal defendant has a constitutional right to choose a jury at the guilt/innocence phase of the proceedings, the defendant's right to choose a jury at the death sentencing hearing is wholly statutory. 720 ILCS 5/9–1(d) (West 2006); *People v. Strickland*, 154 Ill. 2d 489, 517 (1992) (collecting cases). Defendant does not, and based on this record, cannot, contend that the trial court

-16-

did not advise defendant of his option of sentencers at the death sentencing hearing. Rather, defendant posits that "there are certain decision[s] involving constitutional rights that are ultimately for the defendant to decide." According to defendant, since the right to a jury at a death sentencing hearing is statutory and not constitutional, then it is not "a personal decision left to the defendant." Therefore, defendant argues, the election or waiver of a jury at the death sentencing hearing is a matter of trial strategy ultimately for defense counsel to decide. We cannot accept this argument.

It is generally established that "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Florida v. Nixon*, 543 U.S. 175, 187, 160 L. Ed. 2d 565, 578, 125 S. Ct. 551, 560 (2004). Courts have affirmed that a criminal defendant has "the ultimate authority" to decide one such basic trial right–whether to waive a jury. *Nixon*, 543 U.S. at 187, 160 L. Ed. 2d at 578, 125 S. Ct. at 560; *People v. Segoviano*, 189 Ill. 2d 228, 240 (2000).

Prevailing standards of practice elucidate this conclusion. Courts have widely recognized the American Bar Association (ABA) Standards for Criminal Justice as a guide for discerning professional norms. See, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 688, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065 (1984); *Canaan v. McBride*, 395 F.3d 376, 384 (7th Cir. 2005); *People v. Manning*, 227 Ill. 2d 403, 417-18 (2008). The ABA Standards for Criminal Justice provide that certain decisions relating to the conduct of the case are ultimately for the defendant and others are ultimately for defense counsel. The decisions that are for the defendant to make after full consultation with counsel include: "(i) what pleas to enter; (ii) whether to accept a plea agreement; (iii) whether to waive a jury trial; (iv) whether to testify in his or her own behalf; and (v) whether to appeal." ABA Standards for Criminal Justice 4–5.2, at 199-200 (3d ed. 1993). The commentary to this section advises:

> "In making each of these decisions *** the accused should have the full and careful advice of counsel. Although it is highly improper for counsel to demand that the defendant follow what counsel perceives as the desirable course or for counsel to coerce a client's decision through misrepresentation or undue influence, counsel is free to

-17-

engage in fair persuasion and to urge the client to follow the proffered professional advice. Ultimately, however, because of the fundamental nature of decisions such as these, *so crucial to the accused's fate*, the accused must make the decisions himself or herself." (Emphasis added.) ABA Standards for Criminal Justice 4–5.2, Commentary, at 201 (3d ed. 1993).

We are hard-pressed to conceive of a decision more "crucial to the defendant's fate" than whether a single judge or a jury will determine whether the defendant lives or dies.

Although not constitutionally required (see *Spaziano v. Florida*, 468 U.S. 447, 459-60, 82 L. Ed. 2d 340, 351-53, 104 S. Ct. 3154, 3161-62 (1984); *People v. Erickson*, 117 Ill. 2d 271, 289 (1987)), a jury serves two significant functions in a death sentencing hearing. First, the jury acts as a bulwark between the defendant and the State. *Spaziano*, 468 U.S. at 462, 82 L. Ed. 2d at 354, 104 S. Ct. at 3163. The right to trial by a jury composed of laypersons from the community is a safeguard against a corrupt or overzealous prosecution and against a compliant, biased, or eccentric judge. *Williams v. Florida*, 399 U.S. 78, 100, 26 L. Ed. 2d 446, 460, 90 S. Ct. 1893, 1905-06 (1970), cited in *Spaziano*, 468 U.S. at 462, 82 L. Ed. 2d at 354, 104 S. Ct. at 3163. Second, in selecting between imprisonment and death for a capital defendant, a jury maintains a link between contemporary community values and the penal system. *Witherspoon v. Illinois*, 391 U.S. 510, 519 n.15, 20 L. Ed. 2d 776, 783 n.15, 88 S. Ct. 1770, 1775 n.15 (1968), cited in *Spaziano*, 468 U.S. at 462, 82 L. Ed. 2d at 354, 104 S. Ct. at 3163.

For the foregoing reasons, we uphold the trial court's denial of defense counsel's motion for bench sentencing notwithstanding defendant's exercise of his statutory right to a jury for the death sentencing hearing. See, *e.g.*, *Ware v. State*, 360 Md. 650, 703-04, 759 A.2d 764, 792 (2000) ("Whether a defendant is to be sentenced by the court or the jury is a decision for the defendant").

C. "*De Facto* Natural Life" Imprisonment

Defendant next contends that the trial court denied him a fair death sentencing hearing by giving the jury misinformation through

comments during *voir dire* and through written jury instructions. The court told the jury that if the jury found that death was not an appropriate sentence, the court would impose a sentence other than death. Defendant characterizes this information as "incomplete" and "misleading." According to defendant, the trial court should have instructed the jury that his convictions subjected him to a "mandatory minimum" prison term of 107 years, which for defendant, who was 36 years old at the time of trial, was effectively "*de facto* natural life" imprisonment.

The State initially responds that this contention is procedurally forfeited. The record shows that defendant failed to object to the trial court's comments during *voir dire*, failed to offer an alternative jury instruction, and failed to include this issue in his posttrial motion. To preserve this issue for appeal, defendant was required to make a contemporaneous objection at the sentencing hearing and to raise the issue in a postsentencing motion. See *Hall*, 194 Ill. 2d at 352; *Enoch*, 122 Ill. 2d at 186. Likewise, a defendant generally forfeits review of any purported jury instruction error if the defendant does not object to the instruction, or tender an alternative instruction at trial, and does not raise the instruction issue in a posttrial motion. *People v. Herron*, 215 Ill. 2d 167, 175 (2005); *People v. Simpson*, 172 Ill. 2d 117, 150 (1996). Accordingly, this contention is procedurally forfeited.

Seeking our review, defendant invokes the plain-error doctrine. See 134 Ill. 2d R. 615(a); *Piatkowski*, 225 Ill. 2d at 565; *Hall*, 194 Ill. 2d at 352. Supreme Court Rule 451(c) (177 Ill. 2d R. 451(c)) likewise provides a limited exception to the procedural forfeiture of purported jury instruction error in criminal cases and is construed identically with Rule 615(a). *Piatkowski*, 225 Ill. 2d at 564; *People v. Durr*, 215 Ill. 2d 283, 296-98 (2005). However, in addressing defendant's plain-error contention, it is appropriate to determine whether error occurred at all. *Harris*, 225 Ill. 2d at 31; *People v. Durr*, 215 Ill. 2d 283, 298-99 (2005); *Sims*, 192 Ill. 2d at 621.

The trial court told jurors during *voir dire* that if the jury did not conclude that death was an appropriate sentence, the court "would go on to sentencing other than the death penalty" or "[i]t will be a sentence of years in the penitentiary, and the death sentence will be off the table." Correspondingly, the court informed the jury in written jury instructions that if the jury found that defendant was ineligible

for the death penalty, or subsequently concluded that death was not an appropriate sentence, then the "court will impose a sentence other than death." See Illinois Pattern Jury Instructions, Criminal, Nos. 7B.01, 7C.05 (4th ed. 2000) (hereafter IPI Criminal 4th). According to defendant, this information was incomplete and misleading because his convictions subjected him to a "mandatory minimum" prison term of 107 years, which for defendant, was "*de facto* natural life" imprisonment.

Defendant invokes *People v. Gacho*, 122 Ill. 2d 221 (1988), in which this court held that, in a multiple-murder case, the trial court should instruct the jury that, if the jury does not sentence the defendant to death, the defendant will be sentenced to natural life imprisonment, and that no person serving a natural life term can be paroled or released, except through executive clemency. *Gacho*, 122 Ill. 2d at 262. Indeed, a plurality in *Simmons v. South Carolina*, 512 U.S. 154, 129 L. Ed. 2d 133, 114 S. Ct. 2187 (1994), observed that in assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant to the sentencing determination. Holding all other factors constant, it is reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. According to the plurality, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that the defendant never will be released on parole. *Simmons*, 512 U.S. at 163-64, 129 L. Ed. 2d at 142, 114 S. Ct. at 2194 (plurality op.). The plurality opinion notes that, based on *Gacho*, Illinois is in accord with "a large majority of States." *Simmons*, 512 U.S. at 166-67 & n.7, 129 L. Ed. 2d at 144 & n.7, 114 S. Ct. at 2195 & n.7. Defendant argues that the sentencing jury could have believed that he could be sentenced to probation or to a minimal term of imprisonment, which would lead the jury to vote for death to protect the public. According to defendant, the trial court should have instructed the jury that defendant was subject to a prison term that was so long that it was effectively "*de facto* natural life" imprisonment. Had the jury been so informed, it might have found that death was not appropriate.

This contention lacks merit. The United States Supreme Court and this court have already rejected this "functional approach" and have limited the protection recognized in *Gacho* and *Simmons* to

-20-

cases where defendants are ineligible for parole as a matter of law. *Ramdass v. Angelone*, 530 U.S. 156, 169, 181, 147 L. Ed. 2d 125, 138, 145, 120 S. Ct. 2113, 2121, 2128 (2000) (plurality op.) ("*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison"); *Ramdass*, 530 U.S. at 181, 147 L. Ed. 2d at 145, 120 S. Ct. at 2128 (O'Connor, J., concurring) ("*Simmons* entitles the defendant to inform the capital sentencing jury that he is parole ineligible where the only alternative sentence to death is life without the possibility of parole"); *Turner v. Quarterman*, 481 F.3d 292, 296-97 (5th Cir. 2007); *Campbell v. Polk*, 447 F.3d 270, 286-89 (4th Cir. 2006); *Simpson*, 172 Ill. 2d at 150-51 ("A defendant is not entitled to have the jury informed that if defendant is not sentenced to death, he is eligible for a range of possible alternate sentences, including natural life imprisonment"). To accept defendant's contention, in a single-murder case, the jury would have to be informed of all the sentencing alternatives possible under the determinative sentencing system in Illinois. Such information would divert the jury's attention from the defendant's character and the circumstances of the offense and would invite the jury to speculate on possibilities that may or may not occur. *People v. Williams*, 161 Ill. 2d 1, 70-71 (1994); *People v. Simms*, 143 Ill. 2d 154, 180-82 (1991). Accordingly, we find no error in the trial court's failure to inform the jury that defendant was subject to a "*de facto* natural life" term of imprisonment. Having found no error, there can be no plain error. See, *e.g.*, *Harris*, 225 Ill. 2d at 31-32.

Defendant alternatively contends that he was denied the effective assistance of counsel when his trial counsel failed to preserve this issue for review. Claims of ineffective assistance of counsel at a death sentencing hearing are reviewed pursuant to the two-prong *Strickland* standard. *Hall*, 194 Ill. 2d at 354. To demonstrate ineffective assistance, a defendant must show that: (1) the attorney's performance fell below an objective standard of reasonableness, and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's errors, there is a reasonable probability that the sentencer would have concluded that death was not an appropriate sentence. Because the defendant must satisfy both prongs of this test,

the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687, 697, 80 L. Ed. 2d at 693, 699, 104 S. Ct. at 2064, 2069.

In the present case, we have already found no error in the information that the trial court gave to the jury. Therefore, trial counsel's failure to object to such information cannot be deemed deficient in terms of *Strickland*. See, *e.g.*, *Hall*, 194 Ill. 2d at 354; *People v. Alvine*, 173 Ill. 2d 273, 297 (1996).

D. Jury Instruction on Unanimity

Defendant next claims that certain jury instructions at the aggravation/mitigation phase of his death sentencing hearing were conflicting and misleading. Defendant contends that the trial court committed reversible error in giving the State's modified version of IPI Criminal 4th No. 7C.06. According to defendant, the last paragraph thereof contained confusing double-negative language that rendered the paragraph unnecessarily difficult to read. Defendant argues that this paragraph misstated the law regarding when and how the jury was to enter a "no-death" verdict and conflicted with the other instructions and verdict forms. Although the verdict forms contained correct statements of law, defendant argues that "this could not cure the confusion created by the double negative instruction." As such, defendant asks this court to reverse his death sentence and remand the cause to the circuit court for a new death sentencing hearing.

The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence. *People v. Parker*, 223 Ill. 2d 494, 501 (2006); *People v. Ramey*, 151 Ill. 2d 498, 535 (1992); *People v. Hester*, 131 Ill. 2d 91, 98 (1989). Jury instructions should not be misleading or confusing. Their correctness depends not on whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them. *Herron*, 215 Ill. 2d at 187-88. If IPI instructions contain an applicable instruction on a subject about which the trial court determines the jury should be instructed, the trial court must use that instruction, unless the court determines that the instruction does not accurately state the law. 177 Ill. 2d R. 451(a).

-22-

That is, where a pattern instruction does not accurately state the law, Rule 451(a) authorizes the trial court to modify it. 177 Ill. 2d R. 451(a); *Harris*, 225 Ill. 2d at 43. The decision whether to give a nonpattern instruction rests within the sound discretion of the trial court. *People v. Caffey*, 205 Ill. 2d 52, 127 (2001); *People v. Buss*, 187 Ill. 2d 144, 232-33 (1999); *People v. Bush*, 157 Ill. 2d 248, 253 (1993). Whether a court has abused its discretion will depend on whether the nonpattern instruction is an accurate, simple, brief, impartial, and nonargumentative statement of the law. 177 Ill. 2d R. 451(a); *People v. Pollock*, 202 Ill. 2d 189, 211 (2002).

Under our death penalty statute, the second phase of a death sentencing hearing requires the trier of fact to weigh and balance any mitigating factors against the aggravating factors. *People v. Macri*, 185 Ill. 2d 1, 77 (1998); *People v. Munson*, 171 Ill. 2d 158, 185 (1996); *People v. Brownell*, 79 Ill. 2d 508, 533-34 (1980). Prior to November 2003, subsection (g) of the Illinois death penalty statute, which prescribes the procedure for a jury at a death sentencing hearing, provided in pertinent part: "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." 720 ILCS 5/9–1(g) (West 2002).

IPI Criminal 4th Nos. 7C.05 and 7C.06 correspond to former subsection (g). For a defendant who has been convicted of a single murder, No. 7C.05 provides:

> "Under the law, the defendant shall be sentenced to death if you unanimously find that there is no mitigating factor sufficient to preclude imposition of a death sentence.
>
> If you are unable to find unanimously that there is no mitigating factor sufficient to preclude imposition of a death sentence, the court will impose a sentence other than death." IPI Criminal 4th No. 7C.05.

Where a single murder is involved, No. 7C.06 provides in relevant part:

> "In deciding whether the defendant should be sentenced to death, you should consider all the aggravating factors supported by the evidence and all the mitigating factors supported by the evidence.

Aggravating factors are reasons why the defendant should be sentenced to death. Mitigating factors are reasons why the defendant should not be sentenced to death.

* * *

If you unanimously find from your consideration of all the evidence that there is no mitigating factor sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death.

If you do not unanimously find from your consideration of all the evidence that there is no mitigating factor sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death." IPI Criminal 4th No. 7C.06.

This court has upheld these instructions. See, *e.g.*, *People v. Simms*, 192 Ill. 2d 348, 411-15 (2000); *People v. Emerson*, 189 Ill. 2d 436, 503-05 (2000).

Subsequent to the adoption of IPI Criminal 4th Nos. 7C.05 and 7C.06, the General Assembly amended the death penalty statute. See Pub. Act 93–605, §10, eff. November 19, 2003 (amending 720 ILCS 5/9–1 (West 2002)). Subsection (g), which formerly provided that a death sentence would be imposed if the jury found "no mitigating factor sufficient to preclude imposition," now includes the following new language:

"If the jury determines unanimously, *after weighing the factors in aggravation and mitigation, that death is the appropriate sentence*, the court shall sentence the defendant to death. ***

*If after weighing the factors in aggravation and mitigation, one or more jurors determines that death is not the appropriate sentence,* the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." (Emphases added.) 720 ILCS 5/9–1(g) (West 2006).

However, IPI Criminal 4th Nos. 7C.05 and 7C.06 have not yet been revised to track the amended statutory language. Thus, at the time of defendant's trial, the court was confronted with the amended death

-24-

penalty statute, which required the jury to apply a specific guideline in making its determination (unanimously determining that death is the appropriate sentence), and IPI Criminal 4th Nos. 7C.05 and 7C.06, which provided the jury with a different guideline in reaching its verdict (unanimously finding that there is no sufficient mitigating factor sufficient to preclude the death sentence). As such, it was necessary for the trial court to use a modified IPI instruction in this case. See *Harris*, 225 Ill. 2d at 43.

At the jury instruction conference, the State tendered its modified version of IPI Criminal 4th Nos. 7C.05 and 7C.06. Defendant objected and tendered his modified version. The trial court accepted the State's version and refused that of defendant. In refusing defendant's modified No. 7C.06, the trial court found that the State's version was "more in conformance with the I.P.I. book." The trial court instructed the jury with the following modified version of IPI Criminal 4th No. 7C.05:

> "Under the law, the defendant shall be sentenced to death if you determine unanimously, after weighing the factors in aggravation and mitigation, that death is the appropriate sentence.
>
> If, after weighing the factors in aggravation and mitigation, you are unable to determine unanimously that death is the appropriate sentence, the court will impose a sentence other than death."

The trial court also instructed the jury with the following modified version of IPI Criminal 4th No. 7C.06, the last two paragraphs of which instructed the jury as follows:

> "If you unanimously find from your consideration of all the evidence and after weighing the factors in aggravation and mitigation that death is the appropriate sentence, then you should sign the verdict requiring the court to sentence the defendant to death.
>
> *If you do not unanimously find from your consideration of all the evidence and after weighing the factors in aggravation and mitigation that death is not the appropriate sentence,*

-25-

*then you should sign the verdict requiring the court to impose a sentence other than death.*" (Emphasis added.)[2]

The trial court also gave to the jury modified verdict forms, one, submitted by the State, reading: "We the jury unanimously find that death is the appropriate sentence" (see IPI Criminal 4th No. 7C.08), and the other, submitted by defendant, reading: "After weighing the factors in aggravation and mitigation, one juror or more has determined that death is not the appropriate sentence." See IPI Criminal 4th No. 7C.09 (hereafter "no-death verdict").

In English grammar, a double negative refers to a "now substandard syntactic construction containing two negatives and having a negative meaning." Webster's Third New International Dictionary 678 (1993). Defendant argues that the challenged paragraph told the jurors that they must unanimously find that death is not the appropriate sentence before they could sign the no-death verdict. This would obviously be a misstatement of the law. As reflected in the no-death verdict form, the jury need not unanimously find that death is inappropriate before it signs the no-death verdict. In other words, if even one juror found that death was inappropriate, the jury was required to sign the no-death verdict.

Defendant's argument rests on the premise that the apparent double negative reverses the meaning of the challenged paragraph. "It is a truism of traditional grammar that double negatives combine to form an affirmative." The American Heritage Guide to Contemporary Usage and Style 148 (2005); see The World Almanac Guide to Good Word Usage 78 (1989) ("The objection to such constructions is that the negatives cancel each other out and reverse the meaning of the sentence"). However, as a matter of grammar, the challenged paragraph in modified No. 7C.06 does *not* contain "closely placed self-cancelling negatives." R. Burchfield, The New Fowler's Modern English Usage 227 (3d ed. 1996). A double negative "consists of

---

[2]Defendant's tendered version of this paragraph, which the trial court refused, read: "If after weighing the factors in aggravation and mitigation, one or more of you determine that death is not the appropriate sentence, then you should sign the verdict requiring the court to impose a sentence other than death ***."

more than one negative *** *for a single negation.*" (Emphasis added.) M. Steinmann & M. Keller, Good Grammar Made Easy 112 (1995). A double negative "is a statement that contains two negative modifiers, *the second of which repeats the message of the first.*" (Emphasis added.) L. Troyka, Handbook for Writers 295 (2d ed. 1990). The two "nots" in the challenged paragraph were not used for a single negation. The first "not" modifies the words "unanimously find." The second "not" does not repeat the message of the first, but rather modifies the words "the appropriate sentence." This is not the forbidden, self-cancelling usage as exemplified in phrases such as "do not have no money" or "do not hear nothing."

Additionally, the challenged paragraph in modified No. 7C.06 correctly states the law. It begins: "If you do not unanimously find." This plainly refers to one or more, but less than all. Thus, if one juror or more, but less than all jurors, find that death is not the appropriate sentence, then the jury should sign the no-death verdict form. This is almost exactly what the jury was instructed in the no-death verdict form.

Further, we must not consider modified No. 7C.06 in an artificial isolation. Rather, we examine the instruction in light of the overall charge, and construe the instructions as a whole. See *Parker*, 223 Ill. 2d at 501; *Ramey*, 151 Ill. 2d at 537; *Hester*, 131 Ill. 2d at 98. It is sufficient if the instructions given to the jury, considered as a whole, fully and fairly announce the applicable law. *Parker*, 223 Ill. 2d at 501; *Pollock*, 202 Ill. 2d at 210. This court has recognized that to "require absolute and technical accuracy in instructions would, as a general rule, defeat the ends of justice and bring the administration of the criminal law into disrepute and contempt. It is sufficient when instructions, considered as a whole, substantially and fairly present the law of the case to the jury." *People v. Banks*, 7 Ill. 2d 119, 129 (1955) (collecting cases).

Construing the entire series of instructions as a whole, we conclude that the jury was more than adequately instructed on how to enter a no-death verdict. While the phrasing of the challenged paragraph in modified No. 7C.06 was less than ideal, we have concluded that the paragraph was legally correct. Further, the challenged paragraph accords with the no-death verdict form, modified by defendant, and which defendant concedes includes a

correct unanimity standard: "After weighing the factors in aggravation and mitigation, one juror or more has determined that death is not the appropriate sentence." Thus, after weighing the factors in aggravation and mitigation, had the jury chosen to sign a no-death verdict, it would have signed a piece of paper recognizing that one or more of the jurors had determined that death was not the appropriate sentence. IPI Criminal 4th instructs: "Verdict forms are included within the term 'instructions.' " IPI Criminal 4th, User's Guide, at ix. When examining a challenged jury instruction in light of the overall charge and construing the instructions as a whole, this court's review includes verdict forms. See, *e.g.*, *Harris*, 225 Ill. 2d at 43 (concluding that "the instructions and verdict form" conveyed the correct legal principle); *People v. Shaw*, 186 Ill. 2d 301, 329 (1998) (reading instructions collectively and in their entirety, concluding that jury was correctly instructed through "the several instructions and verdict forms"); *People v. Fields*, 135 Ill. 2d 18, 71 (1990) (concluding that "the verdict forms and the other instructions clearly informed" jury of correct legal principles). Indeed, defendant concedes that the instructions contained several correct statements of the unanimity requirement. We cannot say that the trial court abused its discretion by instructing the jury with the challenged instruction.

While defendant's argument fails, our determination of this issue should not be read as an endorsement of the challenged paragraph in modified No. 7C.06 tendered by the State. Rather, defendant's version of No. 7C.06 should be used until this court's Committee on Pattern Jury Instructions in Criminal Cases formally revises this series of instructions to track the language of amended section 9–1(g) of the Criminal Code (720 ILCS 5/9–1(g) (West 2006)).

E. Prosecution Comment on Defendant's Lack of Remorse

Defendant next contends that the prosecutor, during the death sentencing hearing, made several comments on defendant's lack of remorse that violated defendant's constitutional right to remain silent. The State responds that the prosecutor's comments were proper references to defendant's lack of remorse and did not infringe upon his right to remain silent.

A criminal defendant has a fifth amendment right not to testify as a witness in his or her own behalf, and the prosecutor is forbidden to make direct or indirect comment on the exercise of that right. *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110, 85 S. Ct. 1229, 1233 (1965); *People v. Arman*, 131 Ill. 2d 115, 125-26 (1989) (collecting cases); 725 ILCS 5/115–16 (West 2006) (prohibiting comment on criminal defendant's failure to testify). The test for determining if improper comment has been made on a defendant's failure to take the witness stand and testify is whether the reference was intended or calculated to direct the jury's attention to the defendant's neglect to avail himself of his legal right to testify. In making this determination, a court should examine the challenged comments in the context of the entire proceeding. *Arman*, 131 Ill. 2d at 126 (and cases cited therein).

We earlier recounted that, at the second stage of the death sentencing hearing, defendant presented as mitigation evidence the testimony of his half-sister, Anita Henry. The prosecutor ended cross-examining Henry as follows:

> "[Prosecutor]: Miss Henry, has the defendant ever told you that he is sorry for what happened on September 23, of 2000?
>
> [Defense Counsel]: Objection, Judge.
>
> THE COURT: I will sustain the objection.
>
> [Prosecutor]: Has he ever shown you any remorse?
>
> [Defense Counsel]: Objection.
>
> THE COURT: Objection sustained.
>
> [Prosecutor]: Nothing else, Judge.
>
> [Defense Counsel]: I have nothing further. Thank you, Miss Henry.
>
> THE COURT: Thank you. (Witness excused)."

During closing argument, the prosecutor remarked as follows:

> "Look at his time when he's in custody. What does being in custody mean to Joseph Bannister because we got to look at it because that's one of the things you are going to consider. The death sentence is appropriate in light of all the aggravation you have before you, but if he doesn't get a death

-29-

sentence, he's going to be in custody, so you might as well look at what life is going to be for Joseph Bannister[,] In custody, it's not too bad. He gets to talk to people, he gets mail, he gets to watch TV, and he gets to use gang paraphernalia, he gets to be respected by guards. He gets to beat up other prisoners and/or guards. He gets to hang with his fellow GD's, that's Joseph Bannister's life in prison, and he's not there contemplating the horror of what he did. He's not sitting there, 'Say, you know what, I've done some wrong in my life,' have you heard that from Joseph Bannister?

[Defense Counsel]: Objection.

THE COURT: Sustained.

[Prosecutor]: 'I'm sorry,' have you heard any remorse from Joseph Bannister?

[Defense Counsel]: Objection.

THE COURT: I will sustain the objection. Ask the jury to disregard."

The prosecutor further remarked:

"When we were questioning you during jury selection, we told you that you would hear some bad things about Joseph Bannister and some good things about Joseph Bannister. I want–and you would hear some statutory factors. *** Each of us gets to present any non-statutory factors we wish, and I'm going to tell you and you're going to even think of some more because there's a lot out there, you've listened to this evidence for a bit, some of the non-statutory aggravating factors that you can hold against Joseph Bannister when you make your determination that he is more than deserving of the death sentence. *** Henrietta Banks was defenseless. She's defenseless, and he shoots her in the head at close range. Sharon was defenseless for that matter, and he shot her, put that down as another aggravating factor. ***

* * *

Ladies and gentlemen, [in] this country we only survive by obeying the laws. Put it down in bold letters in aggravation that he killed people that had been in court willing to testify against him earlier, that there had been an order of protection,

-30-

a whole set of laws had been developed, to protect people when people are in their violent cycles or violent period, and he disobeyed it. *** Put that down in aggravation. *** [P]ut down that he killed a woman that he knew had two small children. *** Put down the other children were present. Latoria, Cedrick [*sic*], you heard them. He couldn't have missed them being there, and they're screaming, and he killed Henrietta in front of small children, and them paying a price for that forever, and put that down in aggravation.

And while you're at it, put down his flight, that from September 23, 2000 to February 11 of 2001, he's at large. *** Can you imagine the horror and the fear that Sharon Banks felt every time she looked over her shoulder knowing that Joseph Bannister was out there? *** Put that down in aggravation; caught with his false I.D., there's another one. And while you are at it, put down all the abuse he gave to Sharon all those years, off and on through those years, put that down. Disobeying the Court orders, the judge's order, bond, counseling, domestic violence, having a handgun *** have that down. *** Joseph Bannister doesn't care about us, he doesn't care about the court system, put that in aggravation, and no remorse, put that down.

[Defense Counsel]: Objection.

THE COURT: I'll sustain the objection."

Defendant now argues before this court: "By arguing to the jury that it was a factor in aggravation that [defendant] *had not taken the stand during his trial* and expressed remorse for his actions, the prosecutor penalized [defendant] for exercising his Fifth Amendment right to remain silent." (Emphasis added.)

This contention lacks merit. The prosecutor did not say anything about defendant's failure to testify, and the above-quoted remarks plainly were not intended or calculated to draw attention thereto. Rather, the prosecutor's remarks were fair comments on defendant's lack of remorse. In determining the appropriate sentence, the sentencing body is to consider all matters that reflect upon the defendant's personality, propensities, purposes, tendencies, and every aspect of the defendant's life relevant to the sentencing decision.

*People v. Barrow*, 133 Ill. 2d 226, 281 (1989). " 'This court has consistently held that a convicted defendant's remorse or the absence of it is a proper subject for consideration at sentencing.' " *People v. Burgess*, 176 Ill. 2d 289, 317 (1997), quoting *Barrow*, 133 Ill. 2d at 281. The challenged remarks did not derive from defendant's failure to incriminate himself, but rather from defendant's apparent lack of remorse for the shooting, which resulted in Henrietta's death, Sharon's severe injury, and the endangerment and traumatization of their mother and children. See, *e.g.*, *Burgess*, 176 Ill. 2d at 317; *Barrow*, 133 Ill. 2d at 281.

Further, any improper inferences from the prosecutor's comments were cured by the trial court sustaining defense counsel's objections and the court's instructions to the jury to disregard comments to which objections were sustained. *People v. Neal*, 111 Ill. 2d 180, 196 (1985). Defendant argues that "any cure was nullified where the prosecutor deliberately ignored the trial court's ruling and continued with the improper argument." Defendant cites *People v. Weinstein*, 35 Ill. 2d 467 (1966), in which the prosecution represented to the jury that it was the defendant's burden to present evidence creating a reasonable doubt of guilt. After five or six such statements, defense counsel finally objected and the trial court sustained the objection. "Undaunted by the court's ruling, the prosecutor then immediately continued ***. Over all, it appears that some seventeen objections were made, and sustained, as the prosecutors argued to the jury." *Weinstein*, 35 Ill. 2d at 469. This court observed: "Such persistence eliminates the salutary effect of the court's ruling in sustaining objections to the argument." *Weinstein*, 35 Ill. 2d at 471.

However, unlike the obviously improper remarks in *Weinstein*, the challenged comments in this case pertain to defendant's lack of remorse, which is a proper subject for consideration at sentencing. See *Barrow*, 133 Ill. 2d at 281. Further, unlike the persistent improper remarks in *Weinstein*, the challenged remarks in this case were few and fleeting in the context of the entire death sentencing hearing. The jury was instructed that closing arguments are not evidence and that the jury should disregard arguments not based on the evidence. The jury was also specifically instructed not to consider defendant's failure to testify in arriving at its verdict. Thus, any alleged error resulting from the challenged remarks was cured. See, *e.g.*, *People v.*

*Moore*, 171 Ill. 2d 74, 105-06 (1996); *People v. Baptist*, 76 Ill. 2d 19, 30 (1979).


F. *Apprendi* and *Ring*

Defendant lastly contends that the Illinois death penalty statute, as amended, violates the principles announced in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), because the statute does not require the State, at the second stage of the death sentencing hearing, to prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors. This court has repeatedly rejected this argument. See, *e.g.*, *Harris*, 225 Ill. 2d at 50; *People v. Thompson*, 222 Ill. 2d 1, 52-54 (2006); *People v. Mertz*, 218 Ill. 2d 1, 93-94 (2005). Defendant has not persuaded us to overturn these decisions.


III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 13, 2009, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 2006). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.


*Affirmed.*


JUSTICE KILBRIDE, dissenting:

While I agree with the majority's analysis of nearly all issues in this case, I am compelled to dissent from its approval of the State's modified IPI Criminal 4th No. 7C.06. I am most disturbed by the majority's decision to obfuscate defendant's true argument and focus instead on an extended dissection of the argument's grammatical particulars. This unusual approach ignores, rather than seriously

-33-

addresses, the underlying merits of the core assertion stated in defendant's brief, asserting that the instruction "was confusing and misstated the law concerning when and how the jury was to sign a 'no death' verdict."

Moreover, the majority's extensive reliance on highly technical grammar treatises further illustrates the error in applying this approach when reviewing jury instructions. As the majority notes, "[t]he purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence. *People v. Parker*, 223 Ill. 2d 494, 501 (2006); *People v. Ramey*, 151 Ill. 2d 498, 535 (1992); *People v. Hester*, 131 Ill. 2d 91, 98 (1989). Jury instructions should not be misleading or confusing. Their correctness depends not on whether defense counsel can imagine a problematic meaning, *but whether ordinary persons acting as jurors would fail to understand them*. *[People v.] Herron*, 215 Ill. 2d at 187-88." (Emphasis added.) Slip op. at 22. Thus, the critical consideration is the layperson's understanding of the law, as stated in the jury instructions. *Herron*, 215 Ill. 2d at 187-88. While it is possible that the jurors were all thoroughly trained in the identification and interpretation of grammatical aberrations such as double negatives, that assumption remains a highly unreliable basis for proper appellate review. The jurors were also unaided by the six grammar references guiding the majority's analysis, leaving them ill-prepared to parse the linguistic intricacies of the jury instruction ostensibly provided to lead them to the no-death verdict form. Indeed, the highly abstracted and artificial nature of the majority's analysis of this issue should itself be sufficient to give this court pause.

While the majority's careful grammatical analysis has indeed persuaded me that the precise source of the problem with the instruction is *not* the presence of "the 'now substandard syntactic construction' " commonly known as a double negative (slip op. at 26, quoting Webster's Third New International Dictionary 678 (1993)), that conclusion does not even purport to address the real problem asserted by defendant. A careful analysis of the plain meaning of the instruction reveals that it is inherently confusing and legally inaccurate.

The problematic final paragraph of the instruction states:

> "*If you do not unanimously find from your consideration of all the evidence and after weighing the factors in aggravation and mitigation that death is not the appropriate sentence, then you should sign the verdict requiring the court to impose a sentence other than death.*" (Emphasis added.)

Defendant argues that this language is confusing and inaccurate because, when read literally, it tells the jury it must unanimously find that a death sentence is not appropriate before it may sign the no-death verdict.

The majority rejects defendant's interpretation and instead declares the challenged paragraph to be a correct statement of the law based only on a cursory examination of its first six words: "If you do not unanimously find." See slip op. at 27. The majority concludes that these words "plainly refer[ ] to one or more, but less than all," thus instructing the jury to sign the no-death verdict form "if one juror or more, but less than all jurors, find that death is not the appropriate sentence." Slip op. at 27. Unfortunately for defendant, this abbreviated analysis fails to consider the remaining language in the clause.

The problem with the majority's interpretation is apparent when the second "not" is eliminated from the instruction given. The instruction would then state:

> "*If you do not unanimously find from your consideration of all the evidence and after weighing the factors in aggravation and mitigation that death is \*\*\* the appropriate sentence, then you should sign the verdict requiring the court to impose a sentence other than death.*" (Emphasis added.)

Stripped to its barest bones, this instruction would say:

> "*If you do not unanimously find \*\*\* that death is \*\*\* the appropriate sentence, then you should sign the verdict requiring \*\*\* a sentence other than death.*" (Emphasis added.)

That is undeniably a complete and accurate statement of when the jury is to sign the no-death verdict form. It defies both logic and common sense for the majority to conclude, based solely on the initial few words of the instruction, that it could convey the same meaning both with and without the second "not," located, not surprisingly, in

the portion of the instruction remaining wholly unexamined by the majority.

In addition, a comparison of instruction given and the relevant language in the applicable statute further proves the point. The applicable statute states:

> "*If after weighing the factors in aggravation and mitigation, one or more jurors determines that death is not the appropriate sentence,* the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." (Emphasis added.) 720 ILCS 5/9–1(g) (West 2006).

When reduced to its simplest form, the statute reads:

> "*If \*\*\* one or more jurors determines that death is not the appropriate sentence,* the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections." (Emphasis added.) 720 ILCS 5/9–1(g) (West 2006).

The statutory language is simple and clear. It provides an ideal basis for drafting a proper jury instruction. Standing in stark contrast, the instruction approved by the majority states, "*[i]f you do not unanimously find \*\*\* that death is not \*\*\* appropriate*." That clause bears a markedly different meaning from that of the plain statutory language. Thus, the instruction given to the jury does not correctly state the applicable law, contrary to the majority's conclusion. Slip op. at 27.

Indeed, the majority's recommendation of the instruction tendered by defendant but rejected by the trial court acknowledges that it best echoes the statutory language. Slip op. at 28. Defendant's instruction states:

> "If after weighing the factors in aggravation and mitigation, one or more of you determine that death is not the appropriate sentence, then you should sign the verdict requiring the court to impose a sentence other than death \*\*\*." See slip op. at 25 n.2.

A direct comparison shows that defendant's instruction clearly and accurately reflects the statute's simple terminology and structure.

Nonetheless, the majority justifies affirming the trial court's rejection of defendant's accurate instruction in favor of the State's flawed No. 7C.06 by looking at the jury instructions as a whole. The majority specifically relies on the presence of the correct unanimity standard in the no-death verdict form, noting that "*had* the jury chosen to sign a no-death verdict, it would have signed a piece of paper recognizing that one or more of the jurors had determined that death was not the appropriate sentence." (Emphasis added.) Slip op. at 27-28. The hypothetical nature of the premise underlying this rationale is the key to its undoing. The jury's selection of a verdict form is obviously dependent on its understanding of the verdict-choice instructions, the very instructions defendant maintains are incorrect and confusing. Without the benefit of clear and accurate instructions on the unanimity standard, the jury cannot reliably be expected to review the no-death verdict form that mentions the correct standard. Thus, the assertion that providing the correct standard on the no-death form somehow overcomes the confusing and legally inaccurate standard in the challenged instruction merely creates the illusion of a causal connection when none properly exists. We cannot assume that the jury ever examined the no-death verdict form when the instruction leading to its selection was fatally flawed.

Finally, having approved the trial court's decision to give the State's modified No. 7C.06 to the jury despite its acknowledgment that the instruction was "less than ideal" (slip op. at 27), the majority limits the damage done by its ruling only to the instant defendant. The majority directs that

> "our determination of this issue should not be read as an endorsement of the challenged paragraph in modified No. 7C.06 tendered by the State. *Rather, defendant's version of No. 7C.06 should be used* until this court's Committee on Pattern Jury Instructions in Criminal Cases formally revises this series of instructions to track the language of amended section 9–1(g) of the Criminal Code [citation]." (Emphasis added.) Slip op. at 28.

Thus, ironically, defendant's appeal has ensured that other, similarly situated, capital defendants will receive the "benefit" of sentencing juries that have received clear and accurate instructions on a key component of the deliberative process, namely, the selection of

-37-

the proper verdict form. Defendant himself, however, fails to obtain the benefit of having a properly instructed jury decide whether he lives or dies.

Although defendant may well have erred in specifying the exact grammatical source of the confusion and critical legal errors inherent in the State's modified No. 7C.06, he clearly argued that the instruction was confusing and legally inaccurate. My examination of that instruction reveals that he is correct; his sentence should be vacated and the cause remanded for a new sentencing hearing before a properly instructed jury. At a minimum, defendant's core argument deserves to be evaluated on its merits, with a complete examination of the relevant language. Because the majority's analysis has failed to provide this minimal review, I must respectfully dissent.