NOTICE

Decision filed 10/05/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180289-U

NO. 5-18-0289

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Gallatin County. |
| | ) | |
| v. | ) | No. 14-CF-36 |
| | ) | |
| LONNIE L. MANN JR., | ) | Honorable |
| | ) | Thomas J. Foster, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Wharton concurred in the judgment.

**ORDER**

*Held*: The State's improper impeachment of defendant via prior conviction was not reversible error, the defendant voluntarily waived his right to a jury trial, and there was no violation of the speedy-trial or compulsory-joinder statutes. Any contrary argument lacks merit. Defendant's appellate counsel is granted leave to withdraw, and the judgment of conviction is affirmed.

¶ 1     Defendant, Lonnie L. Mann Jr., was convicted of aggravated battery and sentenced to prison. He now appeals from the judgment of conviction. His appointed attorney in this appeal, the Office of the State Appellate Defender (OSAD), concluded this appeal lacked merit, and on that basis filed a motion to withdraw as counsel, along with a brief in support thereof. See *Anders v. California*, 386 U.S. 738 (1967). OSAD provided defendant with a copy of its *Anders* motion and brief. This court gave defendant ample opportunity to file a *pro se* brief, memorandum, or other document explaining why OSAD should not be allowed to withdraw or why this appeal has

1

substantial merit, but defendant did not avail himself of that opportunity. This court examined OSAD's *Anders* motion and brief, as well as the entire record on appeal, and determined this appeal indeed lacks merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of conviction is affirmed.

¶ 2                           BACKGROUND

¶ 3     In August 2014, defendant was charged by information with aggravated battery causing great bodily harm (720 ILCS 5/12-3.05(a)(1) (West 2014)), a Class 3 felony (*id.* § 12-3.05(h)). In April 2016, a second count was filed, charging defendant with aggravated battery causing great bodily harm when the aggravated battery was intentional and involved the infliction of torture, a Class 1 felony (*id.* § 12-3.05(h)). The second count arose from the same facts and circumstances as the original charge. In both counts, the complainant was Teresa Williford.

¶ 4     On February 27, 2017, the circuit court held a pretrial hearing with defendant, defense counsel, and the State. The court stated it had been informed that defendant wished to waive his right to a trial by jury and have a bench trial. The court asked defendant, "You want to waive your right to a jury trial in the case?" Defendant answered, "Yes, sir." The court admonished defendant that only he could decide whether to be tried by a jury or by a judge, and defendant indicated his understanding. Again, the court asked defendant whether he wanted to waive his right to a jury trial, and defendant answered, "Yes, sir. I do." Defendant acknowledged that he signed the jury-waiver form. The court asked defendant, "And you want to be tried by the Court at a bench trial and not a jury?" Defendant answered, "Yes, sir." Defendant stated he did not want additional time to discuss the matter with counsel and that he had already made up his mind. The court said that if defendant wanted more time to speak with counsel, they would stop the hearing and allow for it, but defendant said that he "want[ed] to go forward with the bench trial" and did not need to speak

2

further with counsel. The court asked defendant whether anyone had forced him or threatened him into waiving his right to a jury trial, and defendant answered in the negative. The court asked whether anyone had promised defendant anything for his waiver of the right to a jury trial, and defendant again answered in the negative. Defendant indicated that his waiver was made freely, knowingly, and voluntarily, and that he had no questions about the jury waiver that he wanted to ask the court. Finding that defendant "freely, knowingly and voluntarily waived his right to a jury trial in this case," the court stated that defendant would be tried by the court.

¶ 5    In February 2018, the cause proceeded to bench trial.  The State's evidence showed that on August 19, 2014, Teresa Williford was taken by ambulance to the emergency department at Ferrell Hospital. Both of Williford's eyes were swollen and her chin was bruised. She had lacerations on her lip and above one eyebrow. Her right breast and left shoulder contained very noticeable bite marks. Her arms, legs, and back had multiple areas of bruising and swelling. All the bruises were deep brown, blue, or purple, with none of them appearing very old. Dried blood was on her nose, mouth, and lips. Amphetamines, methamphetamines, and opiates were found in Williford's blood.

¶ 6    Dr. Hisham Youssef, a diagnostic radiologist, reviewed various images taken of Williford at Ferrell Hospital on the day she was brought to the emergency department. Imaging revealed multiple facial bone fractures, including both eye sockets, two fractured ribs, and a right-side pelvis fracture. According to Dr. Youssef, fractures to facial bones would require "a significant amount of force" and would involve "excruciating" pain. The fractured ribs were consistent with punching or kicking. Fractures of the pelvis, which is a large and very stable bone, usually result from "significant trauma" such as motor vehicle accidents or falls from significant heights.

¶ 7    Teresa Williford, who had a prior conviction for possession of methamphetamine, testified that she and defendant were "friends." During the evening of August 18, 2014, Williford drove

defendant from her house in Eldorado to his trailer on Coyle Lane in Equality, Illinois. Because defendant did not have a license, Williford sometimes gave him rides. During the drive, everything seemed normal. Once they arrived at defendant's trailer, he asked her to go outside with him "for some reason." The defendant then asked Williford to "run[ ] away" with him, a question that came "out of the blue" for Williford, who replied that she did not think that was a good idea. "He got really angry" and threatened to kill Williford's daughters while she watched and then to kill her. Defendant hit her in the head and then the stomach. These first blows were delivered as the two stood in the driveway, near Williford's car. She "yelled for help," but defendant told her "not to do that or he would take [her] out." He repeatedly hit Williford in the head, which caused her to fall to the ground. Defendant kicked her and told her to get up. She stood up. She asked him why he was hitting her and asked him to stop, but he "kept on hitting [her] over and over and over."

¶ 8     Williford further testified that defendant told her to go inside the house, where they had a drink. Williford was in "a lot of pain." After a while, defendant "took [her] back outside to the same spot and started over again, hitting [her] really hard in the head to the point where [she] would almost go unconscious." As she lay on the ground, defendant kicked her in the ribs and head, "over and over until [she] got up." As she was lying on the ground, defendant got on the ground next to her, placed her head in "the crease of his elbow," and "squeezed" until she "could hear the bones in [her] skull crack." Then he "put his elbow around [her] throat" and choked her until she was "almost unconscious." Defendant said that he would take her "to the brink of death." He warned her to tell other people that she had been involved in a four-wheeler wreck. At some point, defendant had Williford strip to her underpants to determine whether she had a cell phone. At another point, he forced her to use methamphetamine. At still another, he told her that she could leave, but then he "stabbed the tires" of her car so she could not leave.

4

¶ 9        According to Williford, the beatings "went on for hours," all through the night, and she occasionally lost consciousness. During the last burst of violence, defendant dragged her by her hair toward the trailer and they went inside. He "rammed both his fingers in [Williford's] eye sockets," and she could "feel his fingers behind [her] eyeball" as he tried to "pull [her] eyes out." She ran to the bed. Defendant "kicked [her] in the pelvis and hit [her] a few more times." Then, he left the room. Williford was "exhausted" as she lay on the bed with her feet on the floor, her eyes almost swollen shut. Defendant returned with a "stick" that he attempted to swing "with all his might" at Williford, but she, fearing that it could be the fatal blow, blocked it with her feet and hands. After a final struggle, and with defendant temporarily diverted, Williford was able to escape and ran to a neighbor's house.

¶ 10        Shannon Bradley, the sheriff of Gallatin County, testified that on the morning of August 19, 2014, he received a call to respond, along with an ambulance, to a residence on Coyle Lane. At 6:25 a.m., he arrived at the residence and was admitted by "the homeowner." Lying on the kitchen floor was a woman "with a blanket wrapped around her and she was whimpering." The woman had "severe" facial injuries and was difficult to understand. She said that she had been involved in "an ATV accident." Bradley asked her why she had the blanket on. "The folks there at the residence" explained that the woman was naked when she came to their house. The woman told them her clothes burned in the ATV accident. Bradley did not see or smell anything consistent with a fire. The ambulance arrived and the woman was taken to Ferrell Hospital.

¶ 11        A search of defendant's trailer on Coyle Lane in Equality, Illinois, revealed an apparent bloodstain on a wall in the hallway. A sample of this stain was subjected to DNA analysis at the Illinois State Police forensics lab and, to a reasonable degree of scientific certainty, was found to be Williford's blood. Defendant's shirt was also examined by the forensics lab and, to a reasonable

degree of scientific certainty, contained blood from defendant and Williford. Defendant's trailer also contained a bra on the living-room floor and a bed with apparent bloodstains on and near it. Outside the trailer was a wooden pole on the ground near the back door, a knife near the front steps, and Williford's vehicle with a flat rear tire.

¶ 12    Defendant was arrested on August 19, 2014. An Illinois State Police trooper photographed defendant at the time of his arrest, and two of those photos were admitted into evidence. Later, a correctional officer booked defendant into jail, at which it was noted that defendant had no injuries.

¶ 13    At the jail, defendant was interrogated by two special agents of the Illinois State Police, also on August 19, 2014. The interrogation was audio and video recorded. The camera was focused on defendant's face and upper body. Throughout the interrogation, which was published to the court, defendant was quite animated, oftentimes gesturing with both hands when he described fighting with Williford or when he made his points. Defendant claimed Williford was the aggressor, and he was merely trying to defend himself. He seemed to minimize Williford's injuries.

¶ 14    The defense presented a case in chief, which consisted mainly of defendant's own testimony. Defendant, who was 55 years old, testified that he was at Teresa Williford's house on August 18, 2014, as Williford smoked methamphetamine. Later, she took a shower, and afterwards she sat in her terrycloth robe while balancing a machete on her legs. Defendant repeatedly asked her what she was doing, but she "had a real glazed look in her eyes" and did not respond. Taking the machete from Williford's lap, defendant threw it across the room. Then, he told Williford to "take [him] home." Defendant did not have a driver's license, and Williford oftentimes provided rides. Defendant put his overnight bag in Williford's car. Williford came outside, holding a frozen Gatorade that she tapped with a butcher knife, eating the chunks off the blade. When Williford got inside the car, defendant asked her what she was doing, and she answered that she was eating

frozen Gatorade and that it made her blood feel better, which defendant considered a "bizarre statement." Williford drove to defendant's trailer on Coyle Lane in Equality, Illinois, and defendant "kept an eye on her the whole way."

¶ 15    Defendant further testified that as they arrived at his trailer, he told Williford that he did not want her using drugs, and that she, contrary to her promise, had not stopped associating with drug abusers. He said that he was "done with this" and that he "want[ed] nothing else to do with it." Williford replied that she had given up everything for him. She became "really agitated" and referred to her two children who had been taken away, and adopted, due to her persistent drug use. As they walked to the trailer's front door, Williford still held the knife that she had used to eat the frozen Gatorade. He told her, "don't come no closer with that knife," but she did so. Afraid of what she might be capable of, given that she "wasn't in her right mind" due to drugs, defendant "tackled" her, and they ended up at the bottom of the porch steps. She held on to the knife, but he held on to her wrist, as the two of them "wrestled." He "elbowed" her, hitting her in the face with "everything [he] had." Williford repeatedly kicked him, and he "kicked back." Defendant felt "nicks" on his chest from the knife, and he received "a pretty good cut" across his back, though defendant was unaware of it until the next morning, when his boss drew his attention to it. The struggle continued. Defendant grabbed Williford from behind and wrapped his legs around her. At that point, "she kind of gave up" and released the knife. Defendant kicked the knife away, and Williford started to cry. He invited her inside. They sat and talked about the agreement she had made, and broken, not to associate with drug abusers. Defendant again declared that he no longer wanted anything to do with her. Williford again became "real agitated," and defendant told her that she had to go. He "basically forced her outside."

7

¶ 16    According to defendant, Williford headed toward her car, while he walked back into the trailer, and into his bedroom, to take off his boots. Evening was settling in. Then, Williford appeared in the room, wearing only panties, and suggested they sleep together. She pleaded and said that she was cold. Defendant threw her an old Army jacket. He started to leave the room, but she grabbed a stick from the hallway and hit him, hard, in the head. When he put his hand to his head, she struck him in the hand. The two fought for the stick. Eventually, they reached the back door of the trailer. Defendant tried to push Williford out the back door, but she grabbed his hair, and he went out, too. They landed on the ground and wrestled again. Then, defendant said, "Just stop." Williford "let up and got up" and asked for a drink of water. Defendant told her to get her own drink, and he walked inside the trailer. He saw Williford outside, "milling around" the property, and told her to leave. After that, he placed his furniture against the front door, to block the door, because it could be locked only from the outside. That was the last he saw of Williford.

¶ 17    During cross-examination, the prosecutor asked defendant whether he, in 2004, had been convicted of a federal charge of possession of a machine gun, and defendant answered in the affirmative. Defendant also acknowledged that he was sentenced to more than 80 months in prison, and that he was in the custody of the Bureau of Prisons until after 2009. There was no objection from defense counsel.

¶ 18    After questioning defendant, the prosecutor offered as evidence "an exemplified and self-authenticating" copy of defendant's conviction in the Southern District of Illinois in case No. 02-CR-40068-001. At that time, the prosecutor did not specify the nature of the prior conviction, nor did he offer a reason or rationale for the conviction's admission into evidence. The defense had no objection, and the court admitted the certified copy into evidence that revealed defendant was sentenced to the Bureau of Prisons for 84 months, concurrent, for three federal felony offenses:

8

(1) felon in possession of a firearm, (2) possession of a machine gun, and (3) possession with intent to distribute marijuana.

¶ 19    After the close of evidence, the parties made closing arguments. The State devoted a portion of its closing argument to the credibility of Williford versus the credibility of defendant. One factor to consider, the State suggested, was the fact that defendant had "a prior felony conviction." The prosecutor said nothing more about the prior conviction, and defense counsel did not mention it at all. The court took the matter under advisement.

¶ 20    On March 5, 2018, the court announced its verdicts and found defendant guilty on both counts of aggravated battery. From its detailed discussion, the court found Williford's testimony more credible than defendant's, in large part, because of their "demeanor *** while testifying" and the extent and severity of the injuries suffered by Williford, which the court found consistent with Williford's testimony and inconsistent with defendant's. By way of contrast, the court saw "no or at best very few injuries" to defendant in the photos taken at the time of his arrest or in the interrogation video made the same day. The court did not mention defendant's prior convictions in the Southern District of Illinois. No posttrial motion was filed.

¶ 21    On April 16, 2018, the court held a sentencing hearing. The court heard from 10 sworn witnesses. One witness was a woman who had been battered and choked by defendant, possibly in 2014 but prior to the offenses in this case. Five police officers testified about other crimes that defendant had committed, both before and after the offenses in this case. Among those other crimes were the weapons and drug charges that resulted in federal convictions in the Southern District of Illinois. In a statement in allocution, defendant said that he was "very regretful and apologetic for the harm that Ms. Williford endured" and that he had "a lot of remorse" for his actions. He explained that his misbehavior resulted from a longstanding drug abuse problem. The court found

9

that count I merged with count II. For count II, aggravated battery, a Class 1 felony, the court sentenced the defendant to imprisonment for 10 years and to mandatory supervised release for 2 years. The prison sentence was ordered consecutive to the prison sentences that might be imposed in two Williamson County felony cases, which were pending at the time of sentencing in the instant case. No postsentencing motion was filed.

¶ 22     On May 15, 2018, defendant filed a notice of appeal. The circuit court appointed OSAD to represent defendant.

¶ 23                                    ANALYSIS

¶ 24     Defendant's appointed attorney in this appeal, OSAD, concluded this appeal lacks merit, and it filed an *Anders* motion to withdraw as counsel, along with a brief in support thereof. In its *Anders* brief, OSAD raised three potential appeal issues: (1) whether evidence of prior bad acts was properly presented, (2) whether defendant voluntarily waived his right to a jury trial, and (3) whether the State violated the speedy-trial or compulsory-joinder statutes. These issues were not preserved for review but will be treated as if they were. This court agrees these potential issues have no merit.

¶ 25                                 Prior Bad Acts

¶ 26     First, OSAD raised the issue of whether defendant's federal convictions in the Southern District of Illinois, in case No. 02-CR-40068-001, were improperly presented. The prosecutor asked defendant, during cross-examination, whether he had been convicted on a federal charge of possession of a machine gun. The prosecutor did not explain why he asked this question, and the defense did not object. However, in his closing argument, the prosecutor made clear that he had raised the prior conviction for impeachment purposes, as a means of attacking defendant's credibility as a witness, and for that reason only. Though it drew no objection from the defense,

10

the question was nevertheless improper. Cross-examining a defendant about a prior conviction is, in general, improper. *People v. Madison*, 56 Ill. 2d 476, 488 (1974). The proper way for the State to introduce a defendant's prior conviction as a means of impeaching him or attacking his credibility is "by offering the record or an authenticated copy into evidence when the State is putting in rebuttal evidence." *People v. Kellas*, 72 Ill. App. 3d 445, 452 (1979). Here, the prosecutor did, in fact, offer "an exemplified and self-authenticating" copy of defendant's conviction during rebuttal, but nevertheless defendant was forced to acknowledge the conviction during cross-examination.

¶ 27    The error here, however, was not serious and does not require reversal. "While the presentation of the prior conviction by means of cross-examination was improper, reversal is not required unless the error has deprived defendant of substantial justice or influenced the determination of his guilt." *Madison*, 56 Ill. 2d at 488. The error has neither deprived defendant of substantial justice nor influenced the determination of his guilt. The evidence of guilt, described *supra*, was overwhelming. As the court noted in its findings of fact at the trial's close, the Teresa Williford who testified in court was "unrecognizable" in the photos taken at the hospital on August 19, 2014, while a photo of defendant, taken at the time of his arrest on that same date, did not show any "recognizable injuries to him at all." Nothing in the court's lengthy remarks at the trial's close suggested that the State's error in introducing defendant's prior conviction influenced the determination of guilt. Furthermore, a trial judge, sitting as a factfinder at a bench trial, "is presumed to know the law and to consider only proper evidence in rendering judgment." (Internal quotation marks omitted.) *People v. Duff*, 374 Ill. App. 3d 599, 605 (2007). OSAD's first potential issue is without merit.

11

¶ 28                    Waiver of Right to Jury Trial

¶ 29    Second, OSAD raised the issue of whether defendant waived his right to a jury trial voluntarily. Both the federal and Illinois constitutions guarantee a criminal defendant's right to a trial by jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. A defendant may waive his right to a jury trial by knowingly and understandingly waiving the right in open court. 725 ILCS 5/103-6 (West 2016). No specific admonition or advice from the circuit court is necessary to make the defendant's waiver effective. *People v. Bannister*, 232 Ill. 2d 52, 66 (2008). "The determination of whether a jury waiver is valid cannot rest on any precise formula, but rather depends on the facts and circumstances of each particular case." *Id.* The statutory requirement of a written waiver (725 ILCS 5/115-1 (West 2016)) "is prophylactic in nature, thus allowing a court to conduct a review of the record to establish whether a defendant's jury waiver was made understandingly." *People v. Tooles*, 177 Ill. 2d 462, 468 (1997). Where the facts are not in dispute, the issue of whether defendant knowingly and understandingly, and in open court, waived his right to a jury trial is a question of law, and appellate review is *de novo*. *Bannister*, 232 Ill. 2d at 66.

¶ 30    Here, on February 27, 2017, the report of proceedings confirmed the court thoroughly admonished and questioned defendant regarding his jury waiver. Defendant knew that only he could decide whether to be tried by a jury or by the court, and he freely chose to be tried by the court. Defendant did not need or request additional time to discuss the matter with counsel. He confirmed no improper threats or promises were made. The report of proceedings leaves no doubt that defendant's voluntary jury waiver was made knowingly and with understanding. OSAD's second potential issue has no merit.

¶ 31               Violations of Speedy-Trial or Compulsory-Joinder Statutes

¶ 32     Third, OSAD raises the issue of whether the State violated the speedy-trial or compulsory-joinder statutes. The record disclosed that defendant was taken into custody in this case on August 19, 2014, and bonded out of jail on September 22, 2014. His trial began on February 20, 2018. While in custody, defendant never demanded a speedy trial. Once out on bond, defendant never filed a written demand for a speedy trial. Therefore, he never invoked the speedy-trial act. 725 ILCS 5/103-5(b) (West 2014). Between the time the first (or, original) count of aggravated battery was filed, in August 2014, and the second (or, subsequent) count of aggravated battery was filed, in April 2016, more than 18 months elapsed. Because the two counts arose from the same facts, compulsory joinder might seem to be a possible issue on appeal, but for the fact that no speedy-trial demand was ever filed. " 'Once a speedy-trial demand is filed, the multiple charges are subject to the same speedy-trial period.' " *People v. Hunter*, 2013 IL 114100, ¶ 10 (quoting *People v. Quigley*, 183 Ill. 2d 1, 13 (1998)). Here, where there was no speedy-trial demand filed, there can be no compulsory-joinder issue in this case. Therefore, this potential issue is frivolous.

¶ 33                              CONCLUSION

¶ 34     None of the three potential issues discussed by OSAD in its *Anders* brief have any merit and this court finds no significant error upon review of the record. Accordingly, OSAD is granted leave to withdraw as defendant's counsel on appeal, and the judgment of conviction is affirmed.


¶ 35     Motion granted; judgment affirmed.