2021 IL App (1st) 190242-U & 190243-U

SIXTH DIVISION
December 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 14 CR 06670 |
| | ) | 14 CR 06671 |
| MANUEL BARRERA, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Michael B. McHale, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court.
Justices Mikva and Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant knowingly waived his right to a jury trial.  Defendant did not receive ineffective assistance of counsel.

¶ 2    Following a bench trial, defendant Manuel Barrera was convicted of one count of predatory criminal sexual assault of a child and one count of criminal sexual assault of a family member and was sentenced to two 10-year terms of imprisonment in case 14 CR 6670 and one count of aggravated criminal sexual abuse and sentenced to five years' incarceration in case 14 CR 6671,

all sentences to run consecutively for a total of 25 years' imprisonment. On appeal, defendant argues that he did not knowingly and voluntarily waive his right to a jury, and he received ineffective assistance of counsel. For the foregoing reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Defendant was charged with four counts of predatory criminal sexual assault of a child and four counts of criminal sexual assault of a family member in case 14 CR 6670 arising from events which occurred between July 29, 2007, and July 28, 2013, with regard to his daughter M.B, .and with two counts of aggravated criminal sexual abuse in case 14 CR 6671 arising from events which occurred between May 28, 2009, and May 27, 2010, with regard to his daughter K.B. The two cases were joined. Following a bench trial, defendant was found guilty of one count of predatory criminal sexual assault of a child and one count of criminal sexual assault of a family member and sentenced to two 10-year terms of imprisonment in case 14 CR 6670 and of one count of aggravated criminal sexual abuse and sentenced to five years' imprisonment in case 14 CR 6671. All sentences were to run consecutively, for a total of 25 years' imprisonment.

¶ 5      At trial, defendant's biological daughter, M.B., testified that she was 21-years old, and lived in Long Island, New York with her mother, sister K.B., husband Milton, and one-and-a-half-year-old son Santiago. She had an 11th grade education. M.B. was the youngest of defendant's four children who were born in El Salvador. She and her sisters K.B. and Claudia, and brother Henry, lived with their grandparents in El Salvador until she was 10 years old. Defendant came to El Salvador in 2007 and brought the children to Chicago to live with him, his wife Antonia, and their son Axel.

¶ 6      When she lived in Chicago with her faither, they lived in a two-bedroom apartment on the first floor of a rented house.  M.B., K.B., Claudia and Henry shared one of the bedrooms.  In May of 2007, Antonia took Axel to Mexico for two weeks, leaving ten-year old M.B. and her other siblings alone with defendant.  During the time Antonia was gone, M.B. went to defendant's bedroom where defendant was laying on his bed talking on the phone to M.B.'s mother, who lived in New York. At defendant's request, M.B. laid down on the bed, "looking face to face" at defendant. Defendant told M.B. that her mother wanted to talk to her and that he was going to bring the phone to M.B., so he walked to M.B.'s side of the bed, laid down behind her, and spooned her. He did not give M.B. the phone.  Instead, he ran his hand up her body from her ankle to her waist, his hard penis touching her butt. M.B. felt "weird because [defendant] had never done it. So [she] didn't know why he had done that." M.B. got up and went back to the living room with her brother and sisters. She did not tell her siblings what had happened.

¶ 7      Later that day, when they were alone, defendant told M.B. not to tell anybody about what he did, that "nothing that had happened." For weeks thereafter, defendant told M.B. not to tell anybody and that if she did, he would go to jail and the government would take her and her siblings away because her mother did not want them.  M.B. promised defendant she wouldn't tell anybody because defendant "made her believe that it was something that he was never going to do again. It's something it was like an accident that he had done."

¶ 8      During the time M.B. was between the ages of 11 and 13 years old, defendant sometimes worked in the garage, and when he did, defendant would "routinely" make calls from the garage to Antonia, who would be in the house with the children, to tell Antonia to have M.B. bring things

to him that he said he needed for his work.

¶ 9     Defendant called for M.B. "numerous times," and when he did, M.B. would walk out to the garage with the requested item and enter through the side door, which defendant then locked. Defendant "wouldn't need any help. He would just call [her] to-to-to take advantage of [her]."  He would put M.B. on the boxes he had arranged to make a flat space where he could lay her down, take off all of her clothes, pull his pants and underwear down to his ankles, spread her legs, and put his penis in her vagina. When he was done, defendant would ejaculate on the floor of the garage, then step on it. Defendant did this to M.B. every time he called her out to the garage. M.B. tried to stop defendant by telling him to get off of her or saying that she heard someone coming, "but that wouldn't make him stop." Of all the times defendant penetrated M.B.'s vagina with his penis, in the garage and elsewhere, defendant only used a condom "probably" three times.

¶ 10    On weekends and during the summers when the children were out of school, defendant would take his children to work with him.  He worked fixing up apartments.  Defendant decided which children he wanted to take and told them they had to go with him.  When M.B. went to the apartments alone with defendant, his boss sometimes showed up to see how he was doing, but they were generally alone all day in an empty apartment, usually painting.  When defendant took a break for lunch, he would take M.B.'s clothes off, lay her down on her back on the carpet, pull his pants and underwear down, and put his penis inside her vagina. Sometimes he would "pull it out and then he [would] move his mouth to [M.B.s] vagina" before ejaculating in his hand or on the carpet.  He never ejaculated inside of, or on, M.B. When he was done, defendant put his clothes

back on, acted "like nothing happened," and they would start working again. He would tell M.B. to "smile" and to "act happy."

¶ 11    In the summer of 2010, when M.B. was 14 years old, Antonia took all of M.B.'s siblings except Henry, who stayed home to work, on a week-long trip to the Mall of America in Minnesota, leaving M.B. home to work with her father as punishment for not doing her chores. During that week, defendant slept in the bottom bunk of the twin bunkbeds M.B. shared with her sister. Defendant told M.B. he was sleeping there because he did not trust her and thought Henry would go to her in her room. When M.B. was 11, defendant caught Henry touching M.B.    When defendant went to bed, he pulled M.B. down to the lower bunk, took both of their clothes off, laid on top of her, put his penis inside of her vagina, then ejaculated on the floor or on his hand, though one time he did it on the bed. Once, when M.B. was trying to "get away from [defendant] as fast as [she] could," defendant stopped her as she was climbing up the stairs to the top bunk and started "licking [her] butt." M.B. told him to stop and said she heard her brother coming but "[defendant] was really drunk. Nothing made him stop."

¶ 12    In 2012, Antonia drove M.B.'s brother Axel to swimming and karate lessons on Friday afternoons around five or six, returning home around seven or eight. If defendant was home, Antonia left M.B. and K.B. home.  She left M.B. behind more often because she thought that M.B. did not like her and got along better with the other girls, "so she would always leave [M.B.] behind." When M.B. was left alone with defendant, he would take her to her bedroom, take her clothes off, pull his pants and underwear down, lay her on a bed, and put his penis in her vagina. When he was done, defendant ejaculated on the floor or in his hands, cleaned up the floor with

paper, then walked away to watch television.

¶ 13    Over the years of her abuse, M.B. would come up with ways to stop defendant from abusing her by doing things like telling defendant she had her period. She would cut her finger with a knife or make her nose bleed, and then put the blood on a pad, which she would wear for 10 days or so, because defendant would touch her to see if she was wearing a pad and "usually wanted to see if [M.B.] had any blood." She would also try to stop defendant by telling him that what they were doing was not right and God was going to punish them for it. Defendant would respond that M.B. did not think of that when she was "doing it with [her] brother."

¶ 14    In January 2014, M.B. had moved in with her mother in New York when she received a phone call from the Department of Children and Family Services in Chicago ("DCFS") during which she learned that defendant had also touched K.B. inappropriately. M.B. told the worker from DCFS what defendant had done to her. Prior to the phone call, M.B. had never told anybody what defendant had done because she didn't have any friends, was not allowed to go out, and she could not tell her family; M.B. thought Antonia would not believe her because Antonia blamed M.B. for the time when defendant caught Henry touching M.B. inappropriately, the sisters were "all against each other," and defendant would not let her speak to her mother, saying that her mother was a prostitute who did not want to speak to M.B. or her siblings. On the occasions defendant did let M.B. speak to her mother, defendant told M.B. what to say and listened to their conversations. Defendant had repeatedly told M.B. that if she told anyone about what he had done, the government would put all the children in foster homes, and they would never see each other again because her mother did not want them and would not take care of them.

¶ 15    After M.B. spoke with DCFS, the police began investigating the complaints against defendant. M.B. stated that she told one of the officers that her father hit her with an extension cord and showed the officer the marks on her back. She also told officer that when she dropped some construction blocks, defendant grabbed her ear with "tweezers that you cut wire with" and lifted her up off the ground by her ear and beat her up.

¶ 16    M.B. reported that she suffered from depression, social anxiety, and post-traumatic stress. She cut herself a lot "trying to forget everything he had done," and has marks on her left arm from the cutting. She was unable to breastfeed her son when he was born because every time the doctor put the baby to her breast, it would remind her that her father touched her breast and put his mouth on her, and she felt dirty.

¶ 17    Next, K.B., M.B.'s sister and defendant's biological daughter, testified that she was 23-years old and lived in New York with her mother, son, boyfriend, M.B., and M.B.'s husband. She was born in El Salvador and lived there with her grandmother, uncle and siblings until spring 2007, when defendant came for her and her siblings and took them to live with him, his wife, and their son in Chicago. She had an 11th grade education and worked as a waitress.

¶ 18    Shortly after K.B. moved to the U.S., Antonia went to Mexico with K.B.'s stepbrother Axel for about a month. During this time period, defendant was in contact with K.B.'s mother and let the children talk to their mother, too, but would stand right next to them listening to their conversation, and K.B. was not allowed to talk to her mother when K.B. was alone. Defendant was the only person in the house with a phone. Defendant went out to the garage located at the back of the yard "very often" to "supposedly" clean it, work on a car, listen to music, or drink beer. K.B.

and her siblings would go out to the garage to help defendant, but "it was only like he would only call for [M.B.]" to bring things out to him in the garage, though if M.B. was busy doing other chores, defendant would call for K.B. When K.B. had to go to the garage she would drop off whatever defendant had requested and leave really quickly.

¶ 19    One night when K.B. was 14, defendant drank so much that he was not able get himself from the garage to the house, so K.B. and her older sister Claudia went to the garage to help defendant get inside. As K.B. and Claudia were helping defendant into the house, defendant tried to put his right hand inside K.B.'s shirt. K.B. moved away from him, and when defendant could not get his hand inside her shirt, defendant instead squeezed her breast three times on the outside of her shirt. K.B. knew it wasn't an accident "because he didn't do it just one time. He did it like three times. And then he was like, oops. No, he squeezed it."

¶ 20    The family's house had one bathroom with a shower and a door that locked from the inside but could be unlocked from the outside with a knife or a quarter. When K.B. was around 15, defendant installed a mirror across from the toilet, making it possible to see a person in the shower while sitting on the toilet. Numerous different times, defendant entered the bathroom while K.B. was showering, sat on the toilet and watched her through the mirror.

¶ 21    One night in the spring of 2010 when defendant was drunk, defendant told K.B. to lay down with him, so she sat on the edge of the bed, towards the middle, and Antonia sat on the floor near defendant's head. As K.B. sat there, defendant put his hand inside the back of her pants, moved it down to the middle of her butt, and started moving his hand back and forth over her underwear. K.B. told Antonia that defendant was touching her butt and quickly moved away from

defendant. Antonia said maybe defendant thought K.B. was Antonia, so Antonia got in bed with defendant. Defendant stood up and left the room without touching Antonia.

¶ 22    Defendant worked for a construction company, and occasionally he fixed things in the apartment buildings owned by the company.  Defendant would take the children to help.  M.B. went alone "many times. "Defendant usually told her the night before that he wanted her to come to work the next day, "[b]ut mostly he would go and wake up [M.B.] to go with him in the morning."

¶ 23    K.B. also went with Antonia to take Axel to his afterschool swimming and karate classes. K.B. went with them because she "didn't want to stay alone with [defendant] in the house. So [she] tried to become like friends with [Antonia] so she would take me every time." Over time, K.B. and Antonia developed a closer relationship, and Antonia took K.B. "like everywhere with her." M.B. would have to stay home even when she did her chores because defendant "would always be mad [at M.B.] for something."

¶ 24    K.B. first told Antonia what defendant had done to her when she was 17.  Antonia had asked K.B. why defendant was mad at K.B. and K.B. responded that he was "mad because he wanted to be touching [her], but [she] didn't want him to touch [her]." Both women were crying during the conversation because Antonia said she had gone through the same thing.  K.B. never told anybody before because she did not have anybody to talk to: her father did not let her have friends, she and Claudia were always fighting, her mother was not around and K.B. did not have a phone to call her.  After K.B. told Antonia, Antonia dropped Axel off at her mother's house and took K.B. to the doctor.

¶ 25    After telling Antonia, K.B. went to the police station and spoke to officers but dropped the charges because Antonia and Antonia's brother told K.B. that defendant was going to go to jail and be punished for something "he hadn't really done" "because [her] dad was only touching [her]," and because K.B. was sexually active with Nazario, a 34-year-old man who lived in the basement apartment of their house. K.B. remembered telling the detectives that she was dropping the charges against defendant because she did not want Nazario to go to jail – Nazario was the only one that loved her, and she was she was worried about potential charges against him. When K.B. told Nazario what defendant was doing to her, Nazario told her she had to tell somebody, that it should not be happening in her house.

¶ 26    K.B. later decided to go forward with the charges against defendant.  She was affected by what defendant did to her and knew M.B. was also. M.B. had panic attacks that kept her from being able to keep her job, and she cut herself.

¶ 27    Antonia Barrera, defendant's wife, was called by both sides. For the State, Antonia testified that at the time of trial, she lived in South Bend, Indiana with her sister, brother-in-law, and nephew. Antonia and defendant had two sons together.  Defendant had four children, Claudia, Henry, M.B. and K.B., who were born to another woman and lived in El Salvador until 2007 when they came to live with Antonia and defendant in Chicago.

¶ 28    Antonia testified that her house in Chicago had a garage in the back by the alley that had a small door and the big door where cars entered. Defendant would go into the garage once or twice a week to clean and sweep. She claimed she could not remember defendant ever being alone in the garage doing chores because Henry was "always" with him.  Antonia also admitted that the

statement she made to detectives and an Assistant State's Attorney ("ASA") in March of 2014 indicated that defendant spent time in the garage doing chores while she was in the house or was with the children.

¶ 29    Antonia testified that defendant worked for a construction company and when he was not working construction during the weekends, he did maintenance work at apartment buildings for a different company.  When defendant worked maintenance, he would work from approximately seven in the morning to six or seven at night and took Henry to work with him "every time that he went," and sometimes two of the girls. In 2010 or 2011, Henry began working at a car wash.

¶ 30    In the summer of 2010, Antonia went to Minnesota for four days with K.B., Claudia, Axel, Antonia's brother, and her brother's wife. Defendant stayed home with Henry, M.B., and Antonia's father.  M.B. did not come because Antonia had difficulty dealing with M.B. M.B. did not always listen to Antonia and she and defendant would have to discipline M.B. by not letting her do things she liked to do, such as watch TV, go to a party, or stand in the corner and look at the wall.

¶ 31    Antonia stated that defendant was a strict parent with all four of his children.  Antonia claimed to not remember defendant threatening the children when he was upset with them. Antonia did admit that she told M.B. that if M.B. was not happy with them, "then why doesn't she go and live with her mother, that I could talk to her father and him and I would buy a ticket to go live with her mom." Antonia admitted that defendant told the children that their mother told him that "he should have let [the children] starve [in El Salvador]."

¶ 32    Defendant drank alcohol on the weekends and two or three times a week.  On three

occasions, defendant became so drunk that Antonia needed the children to help her get defendant into the house. On one of those occasions, after K.B. and Claudia had helped Antonia get defendant inside, they took defendant to the girls' bedroom, the nearest place to lay him down, and left defendant standing near the bed. Antonia claimed that because defendant was so drunk, he started to fall backwards and tried to "grab ahold of something and he brought K.B. down with him. So she fell on top of him." When asked if defendant touched K.B.'s lower back that day, Antonia claimed that as defendant was trying to get up, he "was touching and grabbing every which way. So [she thought] that, yes, he maybe did touch her. He was trying to touch the bed, tried to reach to everything. And, yeah, probably he did do that." She never saw defendant's touching of K.B. as anything strange because she and Claudia were there.

¶ 33    Antonia acknowledged that defendant installed two mirrors in the bathroom opposite the sink.

¶ 34    On January 3, 2013, Antonia and K.B. were on their way to the dentist when Antonia "asked K.B. what's the problem because [defendant] tells me that you have a boyfriend." K.B. replied that, "he [was] mad at [her] because he [was] touching [her]," and told Antonia that defendant touched her breast. K.B. was angry when she first told Antonia, then started to cry when Antonia started to cry. Antonia believed K.B., because Antonia was also abused when she was a little girl, and nobody believed her. She then took K.B. to the doctor. Antonia later spoke with the police and workers from DCFS.

¶ 35    At the end of January, shortly after the investigation into defendant started, K.B. and M.B. moved to New York. According to Antonia, M.B. did not want to move.

¶ 36    The parties stipulated that detective Emily Rodriguez of the Chicago police department would testify that she acted as the interpreter for the interview and handwritten statement of Antonia on March 24, 2014, that People's Exhibit 8 was a true and accurate copy of the handwritten statement taken by the ASA on that date, that Antonia reviewed the statement line by line, signed the bottom of each page, had the opportunity to make changes, and initialed any changes.  After the State's exhibits were entered into evidence,  the Stat rested.

¶ 37    Defendant moved for a directed verdict, which the court granted in 14 CR 06670 as to the charges of predatory criminal sexual assault of a child under the age of 13, penis to anus and penis to mouth; criminal sexual assault of a family member under the age of 18, penis to anus, penis to mouth, and mouth to vagina; and aggravated criminal sexual abuse of a family member under the age of 18, penis to buttocks, finding that the testimony did not support a finding of guilty on those counts. The court also granted the motion as to the charge of predatory criminal sexual assault on a child under the age of 13, mouth to vagina, holding that it "wasn't completely sure what the full extent of that conduct or contact was." The court denied defendant's motion as to one charge of predatory criminal sexual assault of a child under the age of 13, penis to vagina; one count of criminal sexual assault of a family member under the age of 18, penis to vagina; and one count of aggravated criminal sexual abuse of a family member under the age of 18, penis to buttocks. The court denied the motion entirely as to case 14 CR 6671. For the defense, Antonia testified that her parents, brothers and sister lived a couple of blocks from her when she lived in Chicago and that she spent a lot with her family while she was living with defendant.  When the children moved to Chicago in 2007, the children's mother sent them a phone for them to share. Antonia claimed that

she did not know to whom the children spoke on the phone, did not "think it [was] true" that the girls were not allowed to speak to friends on the phone, and claimed that she and defendant did not check the phone to see who the girls had been speaking to.

¶ 38      Antonia agreed that defendant was strict with the children and that both she and defendant had a lot of rules for them. The girls were not allowed to have boyfriends, talk to boys on the phone, and never slept at a friend's house.  Defendant would punish the girls by making them stand in the corner with their hands held above their heads.

¶ 39      Antonia claimed that defendant kept his tools in the garage of their home and spent time there once or twice a week.  Defendant would call Henry if he needed help but each of the kids at some point brought things to defendant in the garage. Defendant drank in the yard, not the garage. Occasionally, defendant would drink too much, and Antonia would ask her daughters to help her get defendant back inside the house.

¶ 40      Antonia testified that defendant sometimes took the children to work with him and that Henry went to work every single time defendant took on of the children. She also agreed that in 2011 Henry began working at a car wash about four days a week and admitted that there were times that defendant took the girls to work without Henry. According to Antonia, it was her decision to leave M.B. at home when Antonia went to Minnesota with the other children in 2010 because she was having "many problems with her." M.B. was very rebellious but defendant and M.B. "got along great."  Defendant had asked Antonia to take M.B. on the trip, but Antonia did not want to.

¶ 41     When Axel started taking karate and swimming classes on Friday afternoons in summer of 2012, she took the kids with her when she drove him there.   In November or December of 2012, Antonia learned K.B. was having a relationship with Nazario after she took K.B.'s phone away from her. She claimed that she told K.B. that she did not want K.B. to speak to Nazario again and said she would keep the information between herself and K.B. because she believed K.B. when K.B. promised to end the relationship.

¶ 42     Antonia testified that on January 3, 2013, K.B. told her that defendant had been touching her inappropriately. She claimed that she never saw defendant do anything inappropriate to any of the children.  She did not confront defendant about the accusations.   She did not know what to do, so she took K.B. to the doctor. After taking K.B. to the doctor, Antonia returned home with the police, and the police arrested defendant and put him in the squad car.   After defendant was arrested, DCFS forbade him from having contact with his children, and K.B. and M.B.'s mother came and stayed in Antonia's house for two to three weeks before taking the girls to New York. Antonia claimed that she never saw defendant do anything inappropriate to the children and that if she had she would have never accepted it.

¶ 43     Claudia, defendant's biological daughter, testified that she was unmarried, and worked as a certified nurse assistant. She came to Chicago with her siblings in 2007 to live with her father and Antonia.  Claudia claimed that her father did not drink alcohol on a regular basis when she lived with him, and that he only drank when they had parties, though she did remember one or more times that defendant drank during the evening after coming home from work. She only remembered one time that Antonia had to ask her and her siblings to help defendant inside.

¶ 44    Claudia's biological mother left El Salvador when Claudia was 11 or 12 and Claudia did not have a very close relationship with her. Claudia testified both that she and her mother completely stopped talking after her mother came to Chicago in 2009 and that the last time, she saw her mother was in August 2013, when she visited her mother, M.B., and K.B. in New York. Claudia claimed that M.B. had a good relationship with defendant before she moved to New York, and that M.B. and defendant still spoke at the time of trial, but that K.B. did not speak to defendant.

¶ 45    Claudia testified that her father was strict but that he did not prevent her from calling her mother.   Claudia further claimed she never saw defendant do anything inappropriate to any of her sisters and he never did anything inappropriate to her.  Claudia testified that she and her siblings sometimes went to work with defendant, but claimed that defendant usually took Henry, and that Henry was the only child allowed to go with defendant alone. She also testified that defendant did not work or hang out alone in the garage.  She stated that defendant never asked her or her siblings to bring things to him in the garage.   According to Claudia, all three of the daughters went with her stepmother when she took Axel to karate lessons and Henry would sometimes come, too, because her stepmother "didn't leave [them] in the house alone."  Defendant rested his case. The court found defendant guilty of one count of predatory criminal sexual assault of a child and one count of criminal sexual assault of a family member as to M.B., and one count of aggravated criminal sexual abuse as to K.B.  This appeal followed.

¶ 46                                    ANALYSIS

¶ 47    Defendant argues that the trial court violated his constitutional rights to a jury trial and to due process of law when it accepted his jury waiver without providing adequate admonitions about

the nature of the right he was waiving and without ensuring that his waiver was knowing and voluntary  Defendant argues that because he did not speak English, had no formal education, was illiterate, and had no criminal history aside from two driving misdemeanors, the trial court should have ensured  that he knowingly and voluntarily waived his right to a jury.

¶ 48    Defendant acknowledges that he did not contest the validity of his jury waiver at trial or challenge it in a posttrial motion, and therefore forfeited the issue on appeal. See *People v. Woods*, 214 Ill. 2d 455, 470 (2005) (to preserve an error for review, a defendant must object at trial and raise the issue again in a posttrial motion). He requests that we review his claim under the second prong of the plain error doctrine, which allows a reviewing court to address defects affecting substantial rights when "the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 187 (2005); see also *People v. Bracey*, 213 Ill. 2d 265, 270 (2004) ("Whether a defendant's fundamental right to a jury trial has been violated is a matter that may be considered under the plain error rule."). Since there can be no plain error without error, our first inquiry is whether a clear and obvious error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 49    The right to a jury trial is a fundamental right guaranteed by the federal and state constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13; see also *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). Although the right to a jury trial is fundamental, a defendant remains free to waive that right. *Bracey*, 213 Ill. 2d at 269. However, to be valid, the defendant's waiver "must be knowingly and understandingly made." *Id.*; 725 ILCS 5/103-6 (West 2016)

("[e]very person accused of an offense shall have the right to a trial by jury unless *** understandingly waived by defendant in open court").

¶ 50    Because there is no formulaic admonishment that a trial court must provide before accepting a jury waiver, the validity of a waiver depends on the facts and circumstances of each case. *Bannister*, 232 Ill. 2d at 66. A written waiver, as required by section 115-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-1 (West 2016)), is one way of establishing a defendant's intent, although not dispositive of a valid waiver. *Bracey*, 213 Ill. 2d at 269-70. Additionally, a reviewing court can consider a defendant's silence when his attorney requests a bench trial, and his "prior interactions with the justice system." *People v. Reed*, 2016 IL App (1st) 140498, ¶ 7. A defendant's level of education is also relevant. See *People v. Frey*, 103 Ill. 2d 327, 333 (1984). The critical determination is whether a defendant waived his right to a jury trial with the understanding that "the facts of the case will be determined by a judge and not a jury." *Bannister*, 232 Ill. 2d at 69. When, as here, the facts are undisputed, the validity of a jury waiver is a question of law and our review is *de novo*. *Id.* at 66.

¶ 51    Here, there was no error where the record firmly establishes that the trial court properly admonished defendant regarding his right to a jury trial and ensured that defendant understood that his trial would be decided by a judge and not a jury, and defendant executed a written jury waiver. Prior to the commencement of the trial, the following colloquy occurred:

"[COURT]: Do you have a jury waiver? Mr. Barrera, do you know what a jury trial is?

[DEFENDANT]: Yes.

[COURT]: Do you understand you have a Constitutional right to ask to have a jury trial on both of these cases?

[DEFENDANT]: Yes.

[COURT]: Instead of a jury trial, are you asking that I alone hear the facts of these cases and that I alone will decide if you are guilty or not guilty?

[DEFENDANT]: Yes.

[COURT]: Has anyone promised you anything or threatened you in any way to get you to give up your right to jury trial?

[DEFENDANT]: No.

[COURT]: Your attorney just handed you two pieces of paper. Are those your signatures there?

[DEFENDANT]: Yes.

[COURT]: Do you understand by signing those pieces of paper that's how you give up your jury trial in these two cases?

[DEFENDANT]: Yes.

[COURT]: Jury waiver is executed for both matters."

¶ 52    Defendant relies primarily on *People v. Johnson*, 2019 IL App (1st) 162517, ¶19. *Johnson* is inapplicable where the trial court did not inquire whether defendant wanted a bench or jury trial and the record did not indicate whether defendant knew he had a choice between a bench or jury trial and there was no discussion of a signed jury waiver in open court.

¶ 53    The record clearly shows that the trial court explicitly confirmed that defendant: was aware of his right to a jury trial, knew that he had a constitutional right to a jury trial, understood that the court alone would be hearing his case instead of a jury, defendant wished to waive his right to a jury trial and he had not been made any promises or threats in exchange for his waiver. Further, defendant signed a jury waiver, and the court confirmed in open court that defendant had signed and understood the consequence of the document. See *People v. Gatlin*, 2017 IL App (1st) 143644, ¶ 1.   In addition, defendant was represented by counsel, who was present when defendant was questioned by the court and waived his right to a jury.   While the court did not discuss the difference between a bench and a jury trial, the defendant executed a valid jury waiver form, which is competent evidence of his intent to waive his right to a jury trial. *People v. Bracey*, 213 Ill. 2d 265, 269-270 (2004). As such, we see nothing in the record that would support a finding that defendant's jury waiver was not voluntarily made. Because no error occurred, plain error analysis is without merit and defendant's forfeiture of the jury waiver issue will be honored.

¶ 54    Defendant also argues that defense counsel was ineffective for failing to object to K.B.'s testimony that she told Antonia about defendant touching her inappropriately then eliciting testimony about the conversation from Antonia during the defense case-in-chief. Specifically, defendant argues that the evidence was inadmissible hearsay used to bolster K.B.'s testimony, and that no reasonable strategy existed in allowing the testimony.

¶ 55    To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by

showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* If a claim may be determined on the basis that there is no prejudice, it is not necessary for a reviewing court to consider whether counsel's performance was deficient. See *id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice *** that course should be followed.")

¶ 56    The testimony defendant complains of here was not offered for the truth of the matter asserted and therefore cannot be classified as hearsay.  It was merely offered to explain how the authorities became involved, why M.B. told her story to DCFS and the steps leading to defendant's arrest.  However, even if counsel should have objected to K.B.'s testimony that she told Antonia that defendant touched her inappropriately and should not have elicited testimony from Antonia on direct examination about that conversation, defendant cannot establish prejudice.  A defendant claiming ineffective assistance of counsel based on his trial counsel's failure to object to hearsay testimony cannot establish the prejudice prong of the *Strickland* test if the admissible evidence against the defendant is overwhelming or the inadmissible hearsay evidence is cumulative of admissible evidence. See, e.g., *People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 41, 44; *People v. Alexander*, 354 Ill. App. 3d 832, 846-47 (2004); see also *People v. Torres*, 18 Ill. App. 3d 921, 929 (1974) ("Even if hearsay testimony is improperly admitted, reversal is not warranted where the same matter has been proved by properly admitted evidence.").

¶ 57    Defendant does not challenge the evidence in this case.  K.B.'s credible, consistent and unimpeached testimony was sufficient to support defendant's conviction without the complained-

of testimony. "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541, (1999). Here, the trial court found K.B "gave credible and very, very detailed testimony about what the Defendant did to [her]. [The court] paid close attention to [her] demeanor and [her] affect, and [the court] found that [she was] truthfully expressing deep, emotional pain through [her] testimony." In addition, K.B.'s testimony was significantly corroborated. Antonia testified that defendant sometimes drank in the garage to the point where he needed help getting inside the house and that K.B., on occasion, had helped Antonia get defendant inside after defendant had too much to drink. Antonia testified that K.B., Claudia and Antonia laid defendant down on K.B.'s bed, and defendant was "touching and grabbing every which way" and "probably" touched K.B. Antonia also acknowledged that defendant installed a mirror in the bathroom opposite the shower.

¶ 58 Here, overwhelming admissible evidence established that defendant inappropriately touched K.B. Defendant suffered no prejudice as a result of counsel's alleged errors. Therefore, we cannot find that defense counsel was ineffective.

¶ 59 For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 60 Affirmed.